*Execution Copy*

# TURNKEY CONSTRUCTION CONTRACT

### BETWEEN

## HARQUAHALA GENERATING COMPANY, LLC,
### AS OWNER

### AND

## THE SHAW GROUP INC.,
## AND STONE & WEBSTER, INC.,
### AS CONTRACTOR

## DATED:    AUGUST 13, 2001

Ex J-5

# TABLE OF CONTENTS

PART I - THE WORK PROGRAM ..................................................................................... 1

ARTICLE 1. PROJECT DESCRIPTION ............................................................................ 1

ARTICLE 2. OWNER'S RESPONSIBILITIES ................................................................. 2

  2.1. FACILITY SITE .......................................................................................................... 2
  2.2. OWNER'S REPRESENTATIVE ................................................................................. 2
  2.3. GOVERNMENTAL APPROVALS ............................................................................. 2
  2.4. OPERATIONS PERSONNEL ..................................................................................... 2
  2.5. TAXES ......................................................................................................................... 3
  2.6. FUEL AND OTHER INPUTS ..................................................................................... 3
  2.7. STARTUP POWER ...................................................................................................... 3
  2.8. DELIVERY OF OUTPUT ........................................................................................... 4
  2.9. OTHER FACILITIES .................................................................................................. 4

ARTICLE 3. CONTRACTOR'S RESPONSIBILITIES .................................................... 4

  3.1. BASIC PRINCIPLES ................................................................................................... 4
    3.1.1. Scope of the Work .............................................................................................. 4
    3.1.2. Standard of Performance ................................................................................... 5
    3.1.3. Assignment ......................................................................................................... 6
  3.2. SPECIFIC OBLIGATIONS .......................................................................................... 8
    3.2.1. Design and Engineering ..................................................................................... 8
    3.2.2. Procurement ....................................................................................................... 8
    3.2.3. Spare Parts .......................................................................................................... 9
    3.2.4. Construction ........................................................................................................ 9
    3.2.5. Quality Control ................................................................................................. 10
    3.2.6. Warranty Administration ................................................................................. 11
    3.2.7. Start-Up and Testing ........................................................................................ 11
    3.2.8. Preliminary Operations and Training .............................................................. 11
    3.2.9. Information ........................................................................................................ 12
  3.3. GOVERNMENTAL APPROVALS ........................................................................... 12
  3.4. EXECUTION OF THE WORK ................................................................................. 12
    3.4.1. Retention .......................................................................................................... 12
    3.4.2. Schedules and Facility Management Tools ...................................................... 13
    3.4.3. Responsibility for Subcontractors and Agents ................................................ 14
    3.4.4. Key Personnel .................................................................................................. 15
    3.4.5. Office Space ...................................................................................................... 16
    3.4.6. Labor-Related Delays ....................................................................................... 16
    3.4.7. Hazardous Wastes or Materials ....................................................................... 16
    3.4.8. Encumbrances .................................................................................................. 17
    3.4.9. Cooperation and Coordination ......................................................................... 18
    3.4.10. Publicity .......................................................................................................... 19
  3.5. FACILITY TURNOVER ........................................................................................... 19
  3.6. PRE-TURNOVER ACTIVITIES .............................................................................. 19
    3.6.1. Unit Operations ................................................................................................ 20

*3.6.2. Facility Operations.* ................................................................................................ 20
3.7. FINANCIAL MATTERS. ..................................................................................................... 20
   *3.7.1. Cooperation in Financing.* ..................................................................................... 21
   *3.7.2. Asset Records.* ........................................................................................................ 21

ARTICLE 4. CONTRACTOR'S COMMITMENTS RELATED TO SCHEDULE ........................... 21

4.1. DAMAGES. ...................................................................................................................... 21
4.2. FAILURE TO ACHIEVE SUBSTANTIAL COMPLETION BY THE DATE CERTAIN. .................. 21
4.3. SCHEDULE BONUS. ......................................................................................................... 22
4.4. EMISSIONS GUARANTEE. .................................................................................................. 22

ARTICLE 5. CONTRACTOR'S COMMITMENTS RELATED TO PLANT PERFORMANCE ......... 23

5.1. COMMITMENT. ............................................................................................................... 24
5.2. SPECIFIC GUARANTEES. .................................................................................................. 24
   *5.2.1. Net Electrical Output.* ........................................................................................... 24
   *5.2.2. Net Heat Rate.* ....................................................................................................... 24
   *5.2.3. Noise and Emissions Guarantees.* .......................................................................... 24
5.3. LIQUIDATED DAMAGES AND BONUS FOR SCHEDULE AND PERFORMANCE. ..................... 24
   *5.3.1. Liquidated Damages.* .............................................................................................. 24
   *5.3.2. Performance Bonus.* ............................................................................................... 25

ARTICLE 6. COMMENCEMENT OF WORK ............................................................................ 27

6.1. NOTICE TO COMMENCE ENGINEERING. ............................................................................ 27
6.2. NOTICE TO PROCEED. ..................................................................................................... 27
6.3. CONDITIONS FOR CONTRACT EXECUTION. ...................................................................... 27

ARTICLE 7. INSPECTION ..................................................................................................... 28

7.1. RIGHT OF ACCESS. ......................................................................................................... 28
7.2. OBSERVATION OF TESTS. ................................................................................................ 28
7.3. DEFICIENT WORK. .......................................................................................................... 28
7.4. NO ACCEPTANCE. ........................................................................................................... 29

ARTICLE 8. COMMISSIONING AND MECHANICAL COMPLETION ......................................... 29

8.1. COMMISSIONING PERIOD. ............................................................................................... 29
8.2. MECHANICAL COMPLETION DEFINED. .............................................................................. 29
8.3. PUNCHLIST. ................................................................................................................... 30
8.4. PROCESS. ...................................................................................................................... 30

ARTICLE 9. PERFORMANCE TESTS AND SUBSTANTIAL COMPLETION .............................. 30

9.1. CONDUCT OF FACILITY TESTS. ....................................................................................... 31
9.2. PROCESS. ...................................................................................................................... 31
   *9.2.1. Correction of Defects, Re-Run of Facility Tests.* .................................................... 31
9.3. SUBSTANTIAL COMPLETION. ........................................................................................... 31
   *9.3.1. Substantial Completion on a Per Unit and Facility Basis* ...................................... 32
   *9.3.2. Turnover of Unit.* .................................................................................................. 33
9.4. NOTICE OF SUBSTANTIAL COMPLETION. ......................................................................... 33
9.5. CONTINUING EFFORT TO ACHIEVE PERFORMANCE GUARANTEES. ................................... 33

ARTICLE 10. FINAL COMPLETION ...................................................................................... 34

10.1. FINAL COMPLETION. ..................................................................................................... 34

10.2. Notice of Final Completion. ........................................................... 36
10.3. Extension of Final Completion Date Guaranteed. .......................... 36
10.4. Failure to Achieve Final Completion. ............................................. 37
ARTICLE 11. WARRANTY ........................................................................ 37
11.1. Warranties. .................................................................................... 37
11.2. Remedies. ...................................................................................... 37
11.3. Warranty Period. ........................................................................... 38
11.4. Pinch Point Warranty. .................................................................. 38
11.5. Notice. ........................................................................................... 39
11.6. Assignment of Subcontractor Warranties. ..................................... 39
11.7. Extended Major Equipment Warranties. ........................................ 39
11.8. Warranty Enforcement Remedies. ................................................. 40
11.9. No Implied Warranties. .................................................................. 40
ARTICLE 12. CONTRACT PRICES ........................................................... 41
12.1. Amount. ........................................................................................ 41
12.2. Other Compensation. ................................................................... 41
12.3. Reserved ........................................................................................ 42
12.4. Cost of the Work. .......................................................................... 42
12.5. Costs Not Allowed for Calculating Actual Cost Performance. ....... 45
12.6. Credits Allowed for Offsetting. ..................................................... 46
12.7. Accounting Records. ...................................................................... 46
ARTICLE 13. INVOICING AND PAYMENTS ............................................. 47
13.1. Payments to Contractor. ............................................................... 47
13.1.1. Monthly Payments. ................................................................ 47
13.1.2. Adjustments to Monthly Payments. ....................................... 48
13.2. Bonuses. ........................................................................................ 48
13.3. Progress Report and Invoice. ....................................................... 48
13.4. Interest on Late Payments. ........................................................... 51
13.5. Final Payment. .............................................................................. 51
ARTICLE 14. CHANGES TO THE WORK PROGRAM ............................... 51
14.1. Definition of Change. .................................................................... 51
14.2. Site Conditions. ............................................................................ 52
14.3. Adjustment Due to Changes. ........................................................ 52
14.4. Change Orders. ............................................................................. 52
14.4.1. By Agreement. ....................................................................... 53
14.4.2. By Owner Directive. ............................................................... 53
14.5. Effect on Performance of Work. .................................................... 54
14.6. Contractor Changes for Convenience. ........................................... 54
14.7. Change Order Calculation. ........................................................... 54
ARTICLE 15. FORCE MAJEURE ............................................................... 54
15.1. Excuse from Performance for Force Majeure. ............................... 54
15.2. Notice of Force Majeure. .............................................................. 54
15.3. Relief for Force Majeure. .............................................................. 55
15.4. No Excuse of Obligations to Pay Money. ...................................... 55
15.5. Owner Self Help. ........................................................................... 55

15.6. Schedule Bonus. ........................................................................................................ 56

ARTICLE 16. SUSPENSION ...................................................................................................... 56

16.1. Right to Suspend. ...................................................................................................... 56
16.2. Obligation of Contractor. .......................................................................................... 57
16.3. Effects of Suspension. ............................................................................................... 57
16.4. Ongoing Suspension Costs. ........................................................................................ 57
16.5. Contractor's Right to Suspend Work. ........................................................................ 57

ARTICLE 17. DEFAULT AND TERMINATION ............................................................................. 57

17.1. Contractor Default. ................................................................................................... 58
17.2. Owner's Default Remedies Against Contractor. ........................................................ 59
17.3. Termination by Owner Without Contractor Default. ................................................. 60
17.4. Owner Default. .......................................................................................................... 60
17.5. Contractor's Default Rights Against Owner. ............................................................. 61
17.6. Termination by Contractor Without Owner's Default. ............................................... 62
17.7. Termination by Owner Due to Contractor Abandonment. .......................................... 62
    17.7.1. Events of Abandonment ...................................................................................... 62
    17.7.2. Remedy and Limitation of Liability .................................................................... 63
17.8. Termination of SWP Thermal Island Equipment Supply Contract. ........................... 63
17.9. Wrongful Termination by Owner. .............................................................................. 63

ARTICLE 18. INSURANCE ....................................................................................................... 63

18.1. Contractor's Obligation. ........................................................................................... 63
    18.1.1. Contractor Coverages. ....................................................................................... 63
    18.1.2. Policy Endorsement. ........................................................................................... 65
    18.1.3. Policies Primary. ................................................................................................ 66
    18.1.4. Notice of Changes. ............................................................................................. 66
    18.1.5. Validity. .............................................................................................................. 66
    18.1.6. Insurance Policies/Certificates. ......................................................................... 66
    18.1.7. No Duty of Agents to Verify or Review. .............................................................. 67
    18.1.8. Deductibles. ........................................................................................................ 67
    18.1.9. Premiums and Deductibles. ................................................................................ 67
    18.1.10. Professional Liability. ....................................................................................... 67
    18.1.11. Aircraft Liability Insurance. ............................................................................. 68
18.2. Owner Furnished Insurance. ...................................................................................... 68
    18.2.1. Owner Coverages. ............................................................................................... 68
    18.2.2. Owner Evidence. ................................................................................................. 70
    18.2.3. Other Insurance Requirements. .......................................................................... 70
    18.2.4. Owner Controlled Insurance. ............................................................................. 70

ARTICLE 19. TITLE AND RISK OF LOSS .................................................................................. 70

19.1. Provision of Clear Title. ............................................................................................ 70
19.2. Maintenance of Clear Title. ....................................................................................... 71
19.3. Repair or Replacement Cost Responsibility of Contractor. ...................................... 71
19.4. Safe Delivery. ............................................................................................................ 72

ARTICLE 20. INDEMNIFICATION ............................................................................................. 72

20.1. Contractor Indemnification Obligations. .................................................................. 72
20.2. Owner Indemnification Obligations. ......................................................................... 72

20.3. PROCEDURES. ................................................................................................ 73
20.4. NO LIMITATION OF OBLIGATION. ............................................................... 74
20.5. TAX INDEMNITY. ........................................................................................ 74

ARTICLE 21. CONFIDENTIALITY ............................................................................ 74

21.1. CONFIDENTIAL INFORMATION. ................................................................. 74

ARTICLE 22. INTELLECTUAL PROPERTY CONSIDERATIONS ............................... 75

22.1. USE OF DATA. .............................................................................................. 75
22.2. DATA LICENSE. ........................................................................................... 76
22.3. INDEMNITY AGAINST INTELLECTUAL PROPERTY INFRINGEMENT. ........... 76
22.4. CONTRACTOR'S RESPONSIBILITY FOR LITIGATION. .................................. 77
22.5. ASSISTANCE BY OWNER. ............................................................................. 77
22.6. INJUNCTION. ............................................................................................... 78
22.7. CONTRACTOR'S CONTINUING OBLIGATIONS. ........................................... 78
22.8. LIMITATIONS AND CONDITIONS. ................................................................ 78
22.9. PATENT. ...................................................................................................... 78
22.10. SOFTWARE ESCROW. ................................................................................ 79

ARTICLE 23. ASSIGNMENT. .................................................................................... 79

23.1. ASSIGNMENT BY OWNER. ........................................................................... 79
23.2. ASSIGNMENT BY CONTRACTOR. ................................................................. 79

ARTICLE 24. DISPUTES ........................................................................................... 80

24.1. GOVERNING LAW. ....................................................................................... 80
24.2. DISPUTE RESOLUTION. ............................................................................... 80
    24.2.1. Negotiation. ....................................................................................... 80
    24.2.2. Arbitration. ........................................................................................ 81
    24.2.3. Consolidated Proceedings. ................................................................ 82
    24.2.4. Continuous Work. .............................................................................. 82

ARTICLE 25. LIABILITIES. ....................................................................................... 82

25.1. LIMITATION OF LIABILITY. .......................................................................... 83
25.2. APPLICABILITY. ........................................................................................... 83
25.3. REMEDIES EXCLUSIVE. ............................................................................... 84
25.4. CONSEQUENTIAL DAMAGES. ...................................................................... 84
25.5. BREACH OF CONFIDENTIALITY OBLIGATIONS. ......................................... 84

ARTICLE 26. REPRESENTATIONS AND WARRANTIES ............................................ 85

26.1. BY CONTRACTOR. ....................................................................................... 85
    26.1.1. Existence and Powers. ....................................................................... 85
    26.1.2. Due Authorization and Binding Obligation. ...................................... 85
    26.1.3. No Conflict. ....................................................................................... 85
    26.1.4. Approvals. .......................................................................................... 86
    26.1.5. No Litigation. ..................................................................................... 86
26.2. BY OWNER. .................................................................................................. 86
    26.2.1. Existence and Powers. ....................................................................... 86
    26.2.2. Due Authorization and Binding Obligation. ...................................... 86
    26.2.3. No Conflict. ....................................................................................... 87
    26.2.4. Approvals. .......................................................................................... 87

*26.2.5. No Litigation.* ................................................................................ 87
**ARTICLE 27. NOTICES/COMMUNICATIONS** ................................................ 88
**27.1. NOTICES.** ....................................................................................... 88
**27.2. EFFECT OF NOTICES.** ....................................................................... 88
**27.3. TECHNICAL COMMUNICATIONS.** ......................................................... 89
**ARTICLE 28. MISCELLANEOUS** ..................................................................... 89
**28.1. NON-RECOURSE.** ............................................................................. 89
**28.2. INDEPENDENT CONTRACTOR.** ............................................................ 89
**28.3. EFFECT OF INVALID PROVISIONS.** ...................................................... 89
**28.4. ORDER OF PRECEDENCE.** .................................................................. 90
**28.5. SURVIVAL.** ...................................................................................... 90
**28.6. ENTIRE CONTRACT.** ......................................................................... 90
**28.7. MODIFICATION IN WRITING.** .............................................................. 90
**28.8. CONTINUING OBLIGATIONS.** .............................................................. 90
**28.9. HEADINGS.** ..................................................................................... 91
**28.10. CONFLICT OF INTEREST.** ................................................................. 91
*28.10.1. Reasonable Care.* ...................................................................... 91
*28.10.2. Gifts.* ........................................................................................ 91
*28.10.3. Notification.* .............................................................................. 91
*28.10.4. Books and Records.* ................................................................... 91
**28.11. INDEPENDENT ENGINEER.** ............................................................... 92
**28.12. ACCOUNTING.** ............................................................................... 92
*28.12.1. GAAP.* ....................................................................................... 92
*28.12.2. Time Period.* .............................................................................. 92
*28.12.3. Adjustments.* .............................................................................. 93
**28.13. MWDVBE.** ..................................................................................... 93
**28.14. OWNERSHIP OF WORK PRODUCT AND INSTRUMENTS OF SERVICE.** ...... 94

**ATTACHMENTS**

I    EXHIBIT OF DEFINITIONS

II    EXHIBITS

| Exhibit A | Scope Book |
|-----------|------------|
| Exhibit B | Payment Matters<br>B1 – Maximum Monthly Payment Schedule<br>B2 – Milestone Payment Schedule |
| Exhibit C | Performance and Functional Tests |
| Exhibit D | Performance and Emissions Guarantees |
| Exhibit E | Spare Parts |
| Exhibit F | Equipment and Milestone Schedules |
| Exhibit G | Change Order Procedure |
| Exhibit H | Form of Guaranty |
| Exhibit I | Form of Contractor's Draw Certification |
| Exhibit J | Major Equipment |
| Exhibit K | Governmental Approvals |
| Exhibit L | Real Property |
| Exhibit M | Environmental Control Plan Contents |
| Exhibit N | Approved Vendor List |
| Exhibit O | Interconnection Agreements |
| Exhibit P | Procurement |
| Exhibit Q | Construction |
| Exhibit R | Scheduling and Control |
| Exhibit S | Startup and Training |
| Exhibit T | Article 16, Indemnification and Insurance, of the SWP Thermal Island Equipment Supply Contract |
| Exhibit U | Source Code Escrow Agreement |
| Exhibit V | Actual Cost True-Up Examples |
| Exhibit W | Letter of Credit |

THIS TURNKEY CONSTRUCTION CONTRACT ("Contract") is made and entered into as of the 13th day of August, 2001, by and between Harquahala Generating Company, LLC, a Delaware limited liability company ("Owner"), and The Shaw Group Inc., a Louisiana corporation, and Stone & Webster, Inc., a Louisiana corporation, which shall be jointly and severally liable hereunder and collectively referred to as "Contractor", for the design, engineering, procurement and construction services necessary to provide an electric power facility in the city of Tonopah, Arizona (the "Facility") as more fully described herein.[1]

## RECITALS

WHEREAS, Owner wishes to retain Contractor to perform, and Contractor desires to perform the Work necessary to provide a fully functioning power generation facility on a "turnkey" basis for Owner, as more fully described in this Contract.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## PART I - THE WORK PROGRAM

## ARTICLE 1. PROJECT DESCRIPTION

The Harquahala Project located in Tonopah, Arizona is a nominal 1,040 megawatt gas fired combined cycle plant. The Facility includes three Siemens Westinghouse 501G combustion turbines, three steam turbines and three heat recovery steam generators with associated auxiliaries and balance of plant facilities operating at a wide range of loads. The Facility interconnects to the Hassayampa Switchyard under the terms of the Interconnection Agreement through which it receives and delivers power. Fuel is obtained from El Paso Natural

---

[1] Unless otherwise required by the context in which any defined term appears, capitalized terms shall have the meaning specified in Appendix A, Definitions.

Gas Company. Raw water is obtained from the Central Arizona Water Conservation District under a water supply agreement and from an Owner furnished well supply system. A more detailed description of the Facility is included in Exhibit A, Scope Book.

## ARTICLE 2. OWNER'S RESPONSIBILITIES

2.1. <u>Facility Site.</u>

Owner shall furnish the Facility Site as described in Exhibit L, Real Property. Owner shall allow reasonable rights of ingress to and egress from the Facility Site for Contractor sufficient for the performance of the Work.

2.2. <u>Owner's Representative.</u>

Owner shall designate and identify by Notice to Contractor its Owner's Representative, who shall act as Contractor's primary point of contact with Owner with respect to the execution of the Work.

2.3. <u>Governmental Approvals.</u>

Owner shall secure those Governmental Approvals as are indicated to be obtained by Owner in Exhibit K. Owner shall provide to Contractor customary and reasonably necessary support in connection with Contractor's securing of Governmental Approvals to be obtained by Contractor. Contractor shall provide to Owner customary and reasonably necessary support in connection with Owner's securing of Governmental Permits and Approvals to be obtained by Owner.

2.4. <u>Operations Personnel.</u>

Owner shall provide an initial complement (approximately) ten (10) operations personnel familiar with combined cycle technology (licensed where necessary) for training by Contractor at least sixty (60) Days, but not earlier than one hundred and twenty (120) Days, prior to the anticipated day of Substantial Completion of the first Unit and a second complement for

training at least twenty (20) Days prior to the anticipated day of targeted Substantial Completion of the first Unit. The exact training dates shall be agreed to by Owner and Contractor based on the commissioning schedule.

2.5. Taxes.

If applicable, Owner shall furnish to Contractor a certificate complying with applicable Governmental Rules identifying those components of the Work to be considered exempt from sales and use taxes. All sales and use taxes and any other taxes (except for income taxes) that may be levied by any Governmental Unit on transactions engaged in by Contractor in connection with the Facility, and all property taxes that may be levied in connection with Contractor's real property or tangible or intangible personal property allocable to the Facility shall be the responsibility of the Owner. Owner shall reimburse Contractor for all such taxes. Contractor shall cooperate with Owner to establish appropriate procedures and to minimize the amount of sales and/or use taxes and property taxes allocable to the Facility.

2.6. Fuel and Other Inputs.

Owner shall provide (other than for construction activities which include initial fills and flushing): fuel, raw water (including potable and demineralized), chemicals, and lubricants in quantities typical for normal plant start-up, normal operation, and Performance Tests. The cost of raw water from either Owner furnished well supply system or Central Arizona Project (CAP) after September 1, 2001 will be paid by Owner; however, Contractor shall be responsible for delivering raw water to end users from either Owner's well supply system (interface point as identified in Exhibit A) or the CAP. The cost of requirements in excess of normal requirements shall be a Cost of the Work.

2.7. Startup Power.

After backfeed, Owner shall supply electric energy for the operation and testing of the Facility in accordance with the Milestone Schedule. Such supply obligation shall not include electric energy for construction activities at the Facility Site, which shall be provided by Contractor. Contractor shall pay fifty percent (50%) of the costs to supply electric energy for the operation and testing of the Facility from backfeed to first synchronization as a reimbursable Cost of the Work.

2.8. Delivery of Output.

Upon reasonable notice Owner shall coordinate delivery of electric energy from the Facility at all reasonable times when Contractor desires to conduct start-up, operation, or testing. Such dates shall not be prior to the date set forth in Exhibit F, Equipment and Milestone Schedules.

2.9. Other Facilities.

Owner shall be responsible for providing construction of facilities up to the interconnect points specified in Exhibit A, Scope Book.

ARTICLE 3. CONTRACTOR'S RESPONSIBILITIES

3.1. Basic Principles.

3.1.1. Scope of the Work.

Contractor shall perform all Work specified in this Contract, including the Thermal Island Equipment Supply Contract between Owner, as Purchaser, and Siemens Westinghouse Power Corporation ("SWP") for the Harquahala Generating Project, dated as of July 31, 2001 (hereinafter, the "SWP Thermal Island Equipment Supply Contract"), and all other matters that can be reasonably inferred from this Contract even though not expressly mentioned herein. Contractor has inspected the Facility Site and surrounding areas for access and constructability, reviewed the Scope Book and examined and accepted the SWP Thermal Island Equipment

Supply Contract and the responsibility and obligations associated therewith, and represents that the Scope of Work as specified therein, if properly performed by Contractor, will yield a fully functioning and properly performing Facility capable of satisfying the Performance Guarantees and Contractor's other obligations under this Contract including compliance with Applicable Law and all applicable codes and standards.

### 3.1.2. Standard of Performance

Contractor shall perform and prosecute all Work in accordance with the terms and conditions of this Contract, the Milestone Schedule, all requirements of the Scope Book and the SWP Thermal Island Equipment Supply Contract and in compliance with Applicable Law and Prudent Industry Practices. Contractor shall design, install, test and operate Equipment and systems in a Safe manner, using licensed personnel where required by Governmental Rule or any applicable code. Contractor shall design, construct, install, test and operate the Facility so that, if properly operated and maintained, the Facility will be in compliance with the requirements of all Governmental Approvals and Rules. Owner shall provide Contractor with current versions of all Governmental Approvals set forth in Exhibit K and shall make available to Contractor updated versions thereof as they become available. Contractor shall, within ten (10) days of execution of this Contract, submit an environmental program substantially in the form of Exhibit M and shall submit that program to the Owner for his written acceptance. Following Owner acceptance, Contractor shall comply with all requirements of the environmental control program. All plant, Equipment and materials supplied under this Contract shall be free from defects, shall conform to the standards of material and workmanship prevailing in the industry, shall be designed to adequately perform the function for which such Equipment was specified, and shall conform in all respects to the Scope Book, the detailed design and engineering Work and the terms of this

Contract. All Equipment and materials supplied under this Contract shall be new and of good quality if not otherwise expressly specified in the Scope Book or approved by Owner in writing.

### 3.1.3. Assignment

The parties understand and agree that Owner may, upon five (5) Days' written Notice to Contractor, assign to Contractor, and Contractor shall accept assignment of, all of Owner's right, title and interest in the SWP Thermal Island Equipment Supply Contract. Effective immediately upon such assignment, (1) the entire Scope of Work of the SWP Thermal Island Equipment Supply Contract shall become a part of the Scope of Work of this Contract; and (2) Contractor shall assume all of the Owner's rights, duties and liabilities (except as may otherwise be specified in the assignment notice) pursuant to the SWP Thermal Island Equipment Supply Contract and shall, thereafter, in all respects, treat SWP as its subcontractor for performance of the duties specified in the SWP Thermal Island Equipment Supply Contract. The Contract Price shall be equitably adjusted without markup to Contractor for any approved changes in the SWP Thermal Island Equipment Supply Contract. Contractor shall indemnify and hold Owner harmless of and from all claims and demands by SWP pursuant to the SWP Thermal Island Equipment Supply Contract arising subsequent to such assignment, subject to and in accordance with the limitations of liability provided elsewhere in this Contract. Owner shall indemnify and hold Contractor harmless of and from all claims and demands by SWP arising before the assignment.

During the duration of the assignment of the SWP Thermal Island Equipment Supply Contract, Owner shall be the intended third party beneficiary of all obligations of SWP and all rights of Contractor. Upon assignment by Owner of the SWP Thermal Island Equipment Supply Contract to Contractor, Contractor shall collaterally assign the SWP Thermal Island Major Equipment Supply Contract to Owner pursuant to mutually agreed terms and conditions.

In the event Contractor fails or refuses to pursue promptly Purchaser's rights under the SWP Thermal Island Equipment Supply Contract then, upon Notice to Contractor, Owner may assert any such rights, including the right to pursue directly from SWP liquidated or other damages, and Contractor shall cooperate fully with Owner. Owner shall promptly refund to Contractor any Liquidated Damages or other amounts paid by Contractor and subsequently recovered by Owner from SWP.

Owner shall retain the right at all times to a reassignment of the SWP Thermal Island Equipment Supply Contract back from Contractor, and Owner shall assume all obligations under the SWP Thermal Island Equipment Supply Contract which arise after the date of the reassignment. All obligations under the SWP Thermal Island Equipment Supply Contract (except as may otherwise be specified in the assignment notice), arising after assignment of such contract to Contractor but before reassignment to Owner, shall remain with Contractor.

3.1.4.1. Upon written notice by Owner, effective when sent, the SWP Thermal Island Equipment Supply Contract and all remaining rights, duties and liabilities of the Owner thereunder shall immediately be reassigned to Owner. The Contract Price of this Contract shall be equitably adjusted to reflect the cost of the deleted work, including deduction of the balance of the SWP Thermal Island Equipment Supply Contract price remaining, if any.

3.1.4.2. The SWP Thermal Island Equipment Supply Contract and any letters of credit or other security issued thereunder shall automatically be reassigned to Owner immediately upon an Event of Default which occurs as set forth in Article 17.1(a) or (b) hereof. For purposes of timing, reassignment of the SWP Thermal Island Equipment Supply Contract under this section shall be deemed to have preceded any event or action which, with the giving of notice or the passage of time or both, could give rise to an Event of Default described in Article 17.1(a) or (b) hereof. Notwithstanding anything to the contrary in this section, the Owner, in its sole discretion, may provide Contractor written notice, within five (5) Days of the Event of Default, that it is not exercising its reassignment rights.

3.1.4.3. Contractor shall accept assignment of all work within the scope of the Contract performed prior to the execution of the Contract by Owner and Washington Group International, Inc. ("WGI"). Any of Owner's or WGI's work within the scope of the Contract and performed prior to execution of the Contract may be used by Contractor in its sole discretion; provided, however, that Contractor shall assume full responsibility for any errors or omissions or deficiencies in such work.

3.1.4.4. Contractor shall be the beneficiary of any letters of credit to be provided by SWP under the SWP Thermal Island Equipment Supply Contract for the duration of the assignment. Any guaranty issued in connection with the SWP Thermal Island Equipment Supply Contract shall be retained by Owner. As Contractor may request from time to time, Owner shall reasonably cooperate with Contractor to resolve disputes between Contractor and SWP. Such cooperation may include, at Owner's discretion, a demand for performance under any guarantees issued under the SWP Thermal Island Equipment Supply Contract.

3.2. Specific Obligations.

3.2.1. Design and Engineering.

Contractor shall design and engineer the Facility under the supervision of registered professional engineers and architects licensed to practice their respective disciplines in the State of Arizona as required by any Governmental Rule or any applicable codes. Engineering shall be based on Prudent Industry Practices and the engineering criteria, design criteria, and other information contained in Exhibit A, Scope Book. Contractor's engineering services shall include the preparation of drawings, specifications, schedules, calculations, documents, and estimates, and coordination with the engineering efforts of Subcontractors including equipment contractors, contractors, and startup subcontractors. Contractor shall afford SWP the opportunity, if exercised timely, to participate in the development of those aspects of the facility design that would affect the performance of SWP's obligations under the SWP Thermal Island Equipment Supply Contract. All documents provided to Owner will be in English and all measuring units shall be U.S. English. Contractor shall design, engineer and construct the Facility so that it is capable of being fully operated in compliance with the Performance Guarantees set forth in Exhibit D, the Governmental Approvals set forth in Exhibit K, and the terms and conditions set forth in each of the Interconnection Agreements listed in Exhibit O.

3.2.2. Procurement.

Contractor shall procure all equipment, materials and supplies necessary to complete the Work, including inspection and expediting services. Procurement shall be performed in accordance with Exhibit P. All costs of such items are included within the Contract Price.

3.2.3. Spare Parts.

Contractor, as a Cost of the Work, shall supply, handle and warehouse startup spare parts as well as operational spare parts until the Facility Turnover Date (operational spare parts are not part of the Contract Price unless supplied under the SWP Thermal Island Equipment Supply Contract). Contractor shall deliver to Owner such spare parts, as well as any other miscellaneous spares and special tools as are supplied by equipment contractors. Contractor shall have access to and may use such spare parts in the course of prosecuting the Work, subject to the following. In the event Substantial Completion (Facility) is accomplished prior to Contractor replenishment of Critical Spare Parts as listed in Exhibit E, and if Commercial Operations of the Facility are subsequently interrupted or restricted prior to Final Completion due to the unavailability of such Critical Spare Part(s), Substantial Completion (Facility) shall be deemed automatically withdrawn for the sole purpose of incurring Delay Damages, and a delay in Substantial Completion (Facility) shall be deemed to have occurred. For each one (1) full Day of deemed delay and for each (1) one full Day of continued delay in satisfaction of the obligation with respect to the replenishment of Critical Spare Parts, Contractor shall pay Delay Damages pursuant to Article 4.1 or 4.2 as applicable. Contractor shall promptly (including expediting, if required) replace at its expense any spare parts Contractor or any Subcontractor uses from Owner's inventory as a condition to Final Completion.

3.2.4. Construction.

Contractor shall construct the Facility, furnish management, labor, equipment, tools, temporary facilities and all other services necessary for construction start-up, testing and warranty work including inspection, expediting, shipping, unloading, receiving, handling and warehousing materials, supplies, spare parts and equipment customs clearance and claims. Construction shall be performed in accordance with Exhibit Q. Contractor shall perform all required road, bridge, electrical transmission line, or underground pipeline modifications to

allow equipment to be transported to the Facility Site; obtain and pay for all necessary permits

and bonds or other form of surety; provide and perform all necessary work to move equipment

across underground utilities located on the Facility Site or property adjacent to or en route to the

Facility Site and to protect such utilities from damage as a result of any construction activities.

Contractor shall be responsible for obtaining construction utilities including phone, sewer, solid

waste disposal, electric power and water. Contractor shall bear the cost of such construction

utilities and other consumables and supply services used by Contractor and Subcontractors,

except for the cost of raw water per Article 2.6. Contractor shall provide safety and emergency

apparatus, equipment, training of site personnel and Subcontractors and written procedures for

the protection of personnel, the environment and the Work including incipient stage fire fighting,

emergency response and evacuation, and fire protection systems training.

3.2.4.1. Contractor shall cooperate with Owner, Owner's other contractors
and agents, including the fuel supplier and Interconnection Utility.

3.2.4.2. Contractor and its Subcontractors shall work in harmony with labor
and abide by any applicable labor agreement.

3.2.4.3. Contractor shall use one of the construction companies listed in
Exhibit N to construct the Facility. Contractor shall obtain Owner's approval prior to engaging
alternate contractors or acting as a construction manager using direct hire labor.

3.2.4.4. In the event that Contractor and Owner reasonably determine that the
need for Technical Field Assistance from SWP exceeds commitments provided for in the SWP
Thermal Island Equipment Supply Contract, then Owner shall issue a Change Order for such
additional assistance.

3.2.5. Quality Control.

Contractor shall develop and implement effective quality control, environmental, and

safety programs, in a form acceptable to Owner, as part of the Work. Within ten (10) days after

execution of this Contract, Contractor shall provide to Owner such programs to be used by

Contractor in the performance of the Work, which shall be in form and substance as provided in

Exhibits M and Q attached hereto. Owner shall have the right to review and comment on such

programs and Contractor shall incorporate all reasonable comments into such programs.
Contractor shall cooperate and coordinate with Owner in this regard. Scheduling and control
shall be performed in accordance with Exhibit R.

### 3.2.6. Warranty Administration.

Contractor shall exercise all warranty rights against any Subcontractor in such a
manner as to be in Owner's best interests; provided, however, Contractor shall perform its
warranty obligations under this Contract notwithstanding any dispute with, or failure to perform
by, any Subcontractor; provided, further, that if neither Contractor nor a Subcontractor timely
performs any warranty obligation (such timeliness to be determined in accordance with Article
11 hereof), Owner may require that such Subcontract be assigned to Owner and Owner shall
assert such warranty rights and all amounts, if any, withheld by Contractor from such
Subcontractor shall be promptly delivered to Owner. Contractor agrees to reimburse Owner for
reasonable costs incurred related to the failure of Contractor or any unassigned Subcontractor to
timely perform any warranty obligations after due notification and failure to cure.

### 3.2.7. Start-Up and Testing.

Contractor shall perform the mechanical integrity tests, code tests and hydro tests,
start-up of components, calibration of instruments and relays, flushing and chemical cleaning,
functional verification tests, and other necessary start-up functions. Contractor shall perform the
Performance Tests as described in this Contract including all laboratory testing services related
to emissions, fuel and water quality. Owner shall be provided reasonable advance notice of and
shall have the right to observe all such tests. Start-up shall be performed in accordance with
Exhibit S.

### 3.2.8. Preliminary Operations and Training.

Contractor shall supervise and be responsible for the operation of each of the Units until the Operations Turnover Date with respect to such Unit. Contractor shall provide facilities for and conduct two (2) complete training programs, as specified in Exhibit S for Owner's operations and maintenance personnel. Owner's personnel will be made available to assist Contractor in start-up and testing under Contractor's direction as their other duties allow. Owner shall make an operator available in the control room after first fire, as reasonably requested by Contractor.

### 3.2.9. Information.

Contractor shall provide reasonable notice to Owner for additional data and other needs identified in the Contract including its fuel requirements, which at a minimum shall be prior to 9:00 a.m. Eastern Time (Standard or Daylight, as applicable) one (1) Day before such fuel is needed. Owner shall be entitled to all reasonable information necessary for its full participation and consultation in every phase of engineering, design, schedule, procurement, construction, completion, startup and operation of the Facility.

### 3.3. Governmental Approvals.

Contractor shall secure those Governmental Approvals as are indicated to be obtained by Contractor in Exhibit K, and as may be hereafter identified by agreement of the Parties. In general, Contractor shall obtain construction related permits. Contractor shall on a timely basis provide to Owner support (including written and/or oral testimony) in connection with Owner's securing of Governmental Approvals.

### 3.4. Execution of the Work.

#### 3.4.1. Retention.

Owner shall withhold retention on the SWP Thermal Island Equipment Supply Contract as provided therein.

3.4.2. Schedules and Facility Management Tools

Contractor shall provide to Owner a Master Facility Schedule in CPM format utilizing Primavera (P3 or P3e) software which includes all of the milestones in the Milestone Payment Schedule within thirty (30) Days after execution of this Contract. This Master Facility Schedule will be prepared by Contractor in an acceptable level of detail and will be shared electronically so that Owner's representatives may utilize the full capabilities of Primavera for its analysis of schedule performance. Such schedule shall be fully resource loaded with manhours to demonstrate progress expenditures throughout the Facility and to demonstrate percentage of completion, except commodities loading may be accomplished utilizing other software. Contractor shall update the Master Facility Schedule and the Milestone Schedule monthly and provide Owner with a complete electronic version of the schedule including all details and logic. If any update to the Milestone Schedule or Master Facility Schedule indicates that there will be delay of over two (2) weeks to either Substantial Completion or Final Completion, the Contractor may, at Owner's sole option, be required to accelerate activities to recapture the delayed time to the extent reasonably achievable, and Contractor shall provide the accelerated Schedule to Owner within one (1) week of direction from Owner.

Contractor shall develop and implement a mutually agreeable recovery schedule for schedule items over four (4) weeks late.

Contractor shall provide monthly Contract Schedule updates to SWP. Contractor shall provide a copy of the regular updates of its four-week work plan (with crew by crew detail) as it relates to the SWP Work. Additionally, Contractor shall afford the SWP senior site representative the opportunity to review and retain a hard copy of the project Level 3 schedule as it relates to the SWP Work.

Contractor shall provide SWP with an updated critical path Project start-up schedule at least ninety (90) days prior to the scheduled date of Initial Fire for Unit 1, and with weekly

updates thereto, and afford SWP the opportunity to participate in its routine Project construction schedule review meetings.

    3.4.4.1. A web based project management system shall be established for the facilitation of project information communication between project participants in both parties to this agreement. Such system shall include, for example, the provision of collaborating capabilities such as on line drawing review, check in/out, redline/comment, the provision of workflow capabilities such as web based correspondence and document registers, requests for information ("RFIs"), posting of selected project correspondence and transmittals including change notifications, issues lists, change approvals and registers or logs of the above.

    3.4.3. <u>Responsibility for Subcontractors and Agents.</u>

With the exception of the scope of Work covered by the SWP Thermal Island

Equipment Supply Contract, Contractor may subcontract portions of the Work to any Person

provided, however, that any Subcontractor providing materials, Equipment or services of value

in excess of two hundred fifty thousand dollars ($250,000) and not identified on the Approved

Vendors List provided in Exhibit N hereto shall be subject to the prior written approval of

Owner. Notwithstanding any agreement with any Subcontractor, Contractor shall be solely

responsible for the Work, and shall not be entitled to relief due to the performance or non-

performance of Subcontractors unless so provided as a result of relief granted under Article 15

hereof. In the event of any subcontract relationship, Contractor shall be responsible to assure its

Subcontractor complies with all obligations imposed on Contractor hereunder with respect to the

Work. Each instrument evidencing any subcontract agreement for performance of the scope of

Work covered by this Contract shall provide that, pursuant to assignment terms in form and

substance satisfactory to Owner, the rights and obligations of Contractor under such instrument

are assignable to Owner, its successors and assigns upon Owner's written request following

termination of this Contract. Once a subcontract is approved pursuant to Article 3.4.3 or a

subcontract with a vendor on the Approved Vendor List is executed, Contractor shall not,

without Owner's consent (which shall not be unreasonably delayed or withheld and which

consent shall be deemed given if Owner does not object in writing following five (5) Business Days' written notice from Contractor), terminate any subcontract or approve a change in excess of Twenty-Five Thousand Dollars ($25,000), or materially modify or amend any previously approved subcontract, if such action will (i) constitute a Change under this Contract (unless already agreed to by the Parties pursuant to a Change Order); (ii) adversely affect Owner's remedies and warranties under such subcontract; (iii) reduce the total liability cap (exclusive of insurance and indemnity obligations) thereunder; or (iv) diminish or otherwise adversely affect Owner's rights, as third party beneficiary or otherwise, under any such subcontract. Further, Contractor shall keep Owner apprised of all material disputes with any such Subcontractor and shall not settle any material dispute which affects Owner's rights as a beneficiary of such subcontract without Owner's prior written consent.

### 3.4.4. Key Personnel.

Contractor shall identify to Owner a Facility Manager, a project engineer, a construction site manager, an environmental and safety manager, a project controls manager, a project procurement manager, a site start-up manager and a warranty manager (collectively, "Key Personnel") reasonably acceptable to Owner. The Facility Manager shall (i) have full responsibility for the Work, (ii) act as Owner's primary point of contact with Contractor with respect to execution of the Work and (iii) be available to meet with Owner as reasonably requested by Owner to discuss the Work or any issue related thereto. Owner shall be entitled to all reasonable information necessary for its full participation and prior consultation in every phase of engineering, design, schedule, procurement, construction, completion, startup and operation of the Facility. Contractor shall not change any Key Personnel without the prior written consent of Owner, which shall not be unreasonably withheld. Contractor shall replace

any Key Personnel reasonably requested to be removed by Owner, within thirty (30) Days of receipt of a written request therefor with a person reasonably acceptable to Owner.

### 3.4.5. Office Space.

Contractor shall provide office space at its Facility Site office for six (6) Owner representatives and local inspectors, and suitable facilities for up to ten (10) operators who shall be furnished access to all relevant Facility engineering and construction drawings and documents.

### 3.4.6. Labor-Related Delays.

Contractor has performed a survey of labor availability during the duration of the Facility and shall ensure that all necessary craft labor will be available, such that the "availability" of adequate and skilled field forces will not be a cause of Facility delay. With regard to other causes of labor delays, Contractor shall use its Reasonable Efforts to obtain and maintain a "no-strike" provision in its applicable labor agreements and to minimize the risk of labor-related delays, and shall promptly take any and all commercially reasonable steps that may be available in connection with the resolution of violations of collective bargaining agreements and jurisdictional disputes, including the filing of appropriate processes with any Governmental Unit. Contractor shall advise Owner promptly, in writing, of any actual, anticipated, or threatened labor dispute that might affect the performance of the Work by Contractor or any Subcontractor.

### 3.4.7. Hazardous Wastes or Materials.

Contractor, at Owner's option and expense, shall arrange for the removal, transport, and disposal of any pre-existing Hazardous Wastes or Materials. Any such additional expense or schedule impact shall be set forth in a Change Order. Contractor, at its expense, shall remove, transport and dispose of all Hazardous Wastes or Materials transported, created, or released onto

or from the Facility Site or on or from off-site rights of way and easements by Contractor or created, used, or handled as part of Contractor's construction and start-up activities at the Facility Site.

### 3.4.8. Encumbrances.

Contractor shall take prompt steps to discharge any Encumbrance including, but not limited to, mechanic's liens. If Contractor fails to promptly discharge any Encumbrance, Owner shall promptly notify Contractor in writing and Contractor shall then satisfy or defend any such Encumbrance. Contractor shall have the right to contest any Encumbrance, provided that it first provides to Owner a bond or other assurances of payment reasonably satisfactory to Owner, in the amount of such Encumbrance and in form and substance satisfactory to Owner. Contractor hereby agrees to indemnify, defend and hold harmless Owner, its title insurance provider, and its Lenders and their Affiliates against any and all costs, liabilities, damages, and expenses of whatever nature incurred (including all expenses and attorneys' fees incurred in discharging any liens or claims) as a result of any mechanic's lien, materialman's lien, or other encumbrance asserted or filed by any party who has provided labor or material for the Work against Owner, its title insurance provider, and its Lenders and their Affiliates. In furtherance hereof, Contractor immediately agrees to take whatever actions are necessary to satisfy any such mechanic's lien, materialman's lien, or other encumbrance, or to remove any such mechanic's lien, materialman's lien, or other encumbrance which may be filed. Contractor's obligations with respect to Encumbrances covered by this Article 3.4.8 are subject to the conditions that (a) indemnitee gives Contractor reasonably prompt notice of any such Encumbrance; (b) the indemnitee cooperates in the defense of any such Encumbrance; and (c) Contractor has sole control of the defense and settlement to the extent of Contractor's liability for any such Encumbrance;

provided that Contractor shall confirm in writing its obligation to indemnify the indemnitee with

respect to all costs and expenses with respect to such Encumbrance.

### 3.4.9. Cooperation and Coordination.

Contractor shall cooperate and work in harmony with Owner and Owner's separate

contractors in a timely manner during the performance of the Work provided that, if such

cooperation requires the diversion of Contractor's personnel or other resources, such cooperation

shall be subject to Contractor's ability to complete the Work in accordance with the Milestone

Schedule. Contractor shall provide Owner with all information necessary to and shall assist

Owner in the review of the design of the Facility, work interfaces, work packages, design review,

detailed engineering and procurement schedules, the conduct of inspections, and other matters

relating to the Work. Contractor shall provide such information as is reasonably requested by

Owner relating to the Facility in dealing with Owner's separate contractors, fuel supplier,

Interconnection Utility, Lenders, and any insurers with respect to the Facility, the parties to any

other material project agreement, and/or any Governmental Unit. Contractor shall provide

Owner with advance notice of, and obtain Owner's prior consent to, all significant scheduled

meetings with governmental authorities and shall provide Owner with a reasonable opportunity

to attend such meetings where practicable.

In order to assure that SWP and Contractor coordinate their efforts, Owner shall

establish a committee ("Coordination Committee") composed of representatives from Owner,

Contractor and SWP. Owner and SWP shall each appoint one representative to serve on the

Coordination Committee which shall be formed within thirty (30) Days after the execution of

this Contract. Contractor shall appoint one representative to serve on the Coordination

Committee within the same thirty (30) Day period. Owner and SWP shall each submit the name

of its Coordination Committee Representative for approval by the other parties and Contractor

shall also submit the name of its representative for approval by Owner and SWP. Without diminution of the rights or obligations of the Parties hereunder, the Coordination Committee shall facilitate coordination of the actions of Owner, Contractor and SWP in performing under this Contract. The Parties hereby commit to work together throughout the implementation of the Facility to minimize the financial impact of any changes or backcharges relating to the interface of work between SWP and Contractor, as further described in the SWP Thermal Island Equipment Supply Contract.

3.4.10. Publicity.

Contractor shall obtain Owner's prior written approval of the content of any external announcement, publication, or other type of public communication concerning the Work or the Facility prior to the release of the same by Owner.

3.5. Facility Turnover.

Contractor shall tender possession and control of the Facility to Owner on the Facility Turnover Date. Owner shall thereafter be responsible for its day-to-day security, operation, and maintenance of the Facility (but excluding Contractor equipment and facilities). Contractor shall have such access to the Facility following the Facility Turnover Date as may be necessary or desirable to complete any unfinished Work, to make modifications or repairs to improve Facility performance, to perform further Performance Tests, to carry out warranty obligations, or otherwise to fulfill Contractor's obligations under this Contract. Contractor's Work after the Facility Turnover Date shall be subject to Owner's reasonable commercial requirements.

3.6. Pre-Turnover Activities.

Notwithstanding any other provision of this Contract, Owner shall have the right to cause Commercial Operations of the Facility to commence prior to the Facility Turnover Date to the extent that the Facility is capable of safely generating energy as set forth below:

3.6.1. Unit Operations.

Owner may commence Commercial Operations of one or more Units prior to Substantial Completion thereof unless Contractor reasonably objects to such operation for safety reasons. To the extent that Substantial Completion of a Unit or Facility requires further Performance Tests, including any Unit for which Commercial Operations have commenced, Owner shall cooperate, or shall cause Operator to cooperate, in the performance of such Performance Tests subject to Owner's Commercial Operations requirements. Contractor shall be entitled to an equitable adjustment, pursuant to a Change Order, (i) to the relevant Substantial Completion Date Guaranteed to the extent delay arises solely due to the commencement of commercial operations; and (ii) provided that in the event commercial operations continue for a period in excess of ten (10) Days in the aggregate prior to Substantial Completion (Unit), Contractor shall be entitled to an equitable adjustment of other Contract obligations and the Contract Price hereunder to the extent such extended operation adversely affects the performance of those obligations or increases costs hereunder.

3.6.2. Facility Operations.

Owner may commence Commercial Operations with respect to the Facility prior to Substantial Completion thereof unless Contractor reasonably objects to such operation for safety reasons. To the extent that Substantial Completion (Facility) or Final Completion requires further Performance Tests after Commercial Operations have commenced, Owner shall cooperate, or shall cause Operator to cooperate, in the performance of such Performance Tests; provided, however, that Performance Tests to accomplish Final Completion or Performance Guarantees shall be subject to Owner's Commercial Operations requirements. Contractor shall be entitled to an equitable adjustment, pursuant to a Change Order, (i) to the Performance Test results to account for degradation of the Unit(s) from Commercial Operations of the Unit(s) through Substantial Completion (Facility) pursuant to the degradation adjustment set forth in

Appendix VIII of the SWP Thermal Island Equipment Supply Contract and (ii) for cost, schedule or other relief, in each case, as may be appropriate under the circumstances.

### 3.7. Financial Matters.

#### 3.7.1. Cooperation in Financing.

Contractor shall furnish such information, consents, certifications, opinions of counsel, and other documents or assistance related to this Contract (including any reasonable amendment or addition to this Contract) as may be reasonably requested by Owner for the financing of the Facility or in conjunction with any Financing Agreement.

#### 3.7.2. Asset Records.

As and when requested, Contractor shall furnish to Owner all commercially reasonable information including lists of all Equipment make, model and serial numbers, and instrument indices for Owner to establish and maintain fixed asset records, such information to be provided in a format to be timely specified by Owner and shall take all steps necessary to record title and ownership of such Equipment in Owner.

## ARTICLE 4. CONTRACTOR'S COMMITMENTS RELATED TO SCHEDULE

Contractor shall perform the Work so as to achieve Substantial Completion not later than the Substantial Completion Date Guaranteed (the "Schedule Guarantee").

### 4.1. Damages.

Contractor understands that if Substantial Completion of each Unit and the Facility is not achieved by the relevant Substantial Completion Date Guaranteed (Unit or Facility), Owner will suffer substantial damages, including additional interest and financing charges, and other operating and construction costs and charges. Therefore, Contractor agrees that if Substantial Completion with respect to a Unit or the Facility is not achieved by the Substantial Completion Date Guaranteed (Unit or Facility), Contractor shall pay to Owner as Liquidated Damages and

not as a penalty no later than thirty (30) Days after the end of each month during which any delay is sustained, Delay Damages as set forth in Article 5.3. Recovery of Liquidated Damages which are the sole responsibility of SWP and paid by the Contractor shall initially be pursued and collected by Contractor or by Owner at Owner's sole option without relieving Contractor of its obligations hereunder.  Subject to Article 4.2, 17.1(h) and 17.1(i), such payment of Liquidated Damages shall be the sole liability of Contractor and the sole remedy of Owner under this Contract with respect to such failure to achieve such Substantial Completion by the Substantial Completion Date Guaranteed (Unit or Facility).

4.2. <u>Failure to Achieve Substantial Completion by the Date Certain.</u>

Notwithstanding any other provision of this Contract, if Substantial Completion of each Unit and the Facility has not occurred by the Date Certain, all liquidated damages which have accrued and are outstanding pursuant to this Contract, whether pursuant to this Article for delay or pursuant to Article 5 for performance, or otherwise, shall become due and payable on the Date Certain, and Contractor shall deliver all items required to be delivered pursuant to Article 10.1.  In addition to other remedies available to Owner hereunder, if a Unit or the Facility cannot complete Performance Tests other than for reasons attributable to Owner, the maximum Performance Liquidated Damages for Net Electrical Output, Net Heat Rate and all Delay Damages as set forth in Article 5.3.3 shall become due and payable.

4.3. <u>Schedule Bonus.</u>

In the event that Substantial Completion (Unit) for any Unit occurs before Substantial Completion Date Guaranteed (Unit), Owner shall pay to Contractor a bonus for each one (1) full Day by which Substantial Completion (Unit) for any Unit occurs before the Substantial Completion Date Guaranteed (Unit).  No payment shall be made for fractional Days.  The Schedule Bonus shall equal the sum of the lesser of (a) $32,000 per Unit or (b) twenty-five

percent (25%) of the Net Revenues, for each Day occurring after Substantial Completion (Unit) of a Unit and before Substantial Completion Date Guaranteed (Unit). In the event Contractor earns a Schedule Bonus, it will submit a Notice to Owner stating the number of Days for which Contractor believes it has earned a Schedule Bonus. Within thirty (30) Days of the Substantial Completion Date Guaranteed (Facility), Owner will notify Contractor of the actual amount of the Schedule Bonus earned based on the Net Revenues calculation. Contractor will include such amount of the Schedule Bonus on its next invoice. In addition, Owner shall pay directly to SWP any schedule bonus due to SWP under the SWP Thermal Island Equipment Supply Contract and approved by the Contractor, and such amounts shall not be a Cost of the Work.

In the event the Substantial Completion Date Guaranteed (Facility) is extended due to an event of Force Majeure, the amount of any Schedule Bonus shall be reduced by fifty percent (50%) for each Day between the Substantial Completion Date Guaranteed (Facility) prior to allowing for the event of Force Majeure and the Substantial Completion Date (Facility) after allowing for the event of Force Majeure.

4.4. Emissions Guarantee.

Notwithstanding the payment of any Performance Liquidated Damages or Delay Damages, if Contractor is unable to demonstrate achievement of the Emissions Guarantee, Contractor shall, with Owner's cooperation, work in good faith to rectify the nonconformance, including by taking any of the following actions: (a) fixing the defective condition, (b) purchasing emissions credits (if available) and/or (c) seeking to change permit conditions.

## ARTICLE 5. CONTRACTOR'S COMMITMENTS RELATED TO PLANT PERFORMANCE

5.1. Commitment.

Contractor guarantees that the Facility performance will at least satisfy the standards of the Performance Guarantees. Contractor guarantees that each Unit shall either (i) satisfy the Performance Guarantees or (ii) satisfy the Minimum Performance Criteria, subject to payment of Performance Liquidated Damages as set forth in Article 5.3.3.

5.2. Specific Guarantees.

5.2.1. Net Electrical Output.

Contractor guarantees that each Unit and the Facility will achieve a Net Electrical Output at least equal to the Net Electrical Output Guaranteed as set forth in Exhibit D.

5.2.2. Net Heat Rate.

Contractor guarantees that each Unit will achieve a Net Heat Rate no greater than the Net Heat Rate Guaranteed as set forth in Exhibit D.

5.2.3. Noise and Emissions Guarantees.

The Net Electrical Output and Net Heat Rate and the successful performance of the Reliability Tests shall be achieved in compliance with the Noise Guarantees and the Emission Guarantees set forth in Exhibit D, Performance and Emissions Guarantees. Performance Tests shall not be required to be performed following remedial Work to satisfy the Noise Guarantee if in Owner's reasonable judgment the remedial Work is not likely to affect performance.

5.3. Liquidated Damages and Bonus for Schedule and Performance.

5.3.1. Liquidated Damages.

In the event of a failure to achieve the Performance Guarantees with respect to Net Electrical Output or Net Heat Rate, or both, Contractor shall pay to Owner as Liquidated Damages, and not as a penalty, Performance Liquidated Damages calculated in accordance with

Article 5.3.3.  Provided Contractor achieves Substantial Completion, Performance Liquidated Damages shall be Owner's sole remedy for failure of Contractor to satisfy the relevant Performance Guarantees.

### 5.3.2. Performance Bonus.

If Contractor achieves performance levels in excess of the Performance Guarantees with respect to Net Electrical Output or Net Heat Rate, or both, Contractor shall have the opportunity to earn a Performance Bonus calculated in accordance with Article 5.3.3.  Any Performance Bonus eligibility shall be determined at the time of the final Balance of Plant Capability Test.  A Performance Bonus based on Net Electrical Output shall only be earned to the extent that such enhanced performance can be utilized by Owner consistent with all Governmental Approvals, Interconnection Agreements, and Balance of Plant design.  Owner shall promptly inform Contractor upon becoming aware of any potential limitation upon Net Electrical Output imposed by these considerations.  Any Performance Bonus due shall be paid by Owner to Contractor in five (5) equal installments commencing thirty (30) Days following Final Completion.  Performance Bonuses shall be payable only out of Owner's Net Revenues. The Performance Bonuses set forth herein include performance bonuses payable to SWP and shall be allocated according to each party's contribution to such performance.  At Contractor's option, Owner shall pay SWP's portion of the Performance Bonuses directly to SWP.

### 5.3.3   Schedule and Performance Bonuses/Liquidated Damages.

To determine the amount of the bonus payment, if any, to be made by Owner to Contractor, the following values shall be used: (a) if liquidated damages have been assessed for any other Unit pursuant to Article 5.3.1: $800/kw for improvements in net electrical output and $63,000/BTU/Kwh for improvements in net heat rate utilizing the Performance Tests, in each case, as adjusted for degradation utilizing the degradation curves for bonuses provided in

Appendix VIII of the SWP Thermal Island Equipment Supply Contract, up to the value of the liquidated damages assessed pursuant to Article 5.3.1 and (b) if liquidated damages have not been assessed for any other Unit or if all liquidated damages assessed for any other Unit pursuant to Article 5.3.1 have been offset pursuant to the application of clause (a) above: $400/kw for improvements in net electrical output and $31,500/BTU/Kwh for improvements in net heat rate utilizing, in each case, the Performance Test results without adjustment for degradation. An example of the foregoing method for determining the amount of any bonus payment is found in Appendix VII of the SWP Thermal Island Equipment Supply Contract.

| Bonus/Liquidated Damage | Amount | Subcap (of Contract Price) |
|---|---|---|
| Output Bonus (natural gas) * | $400/kw | No |
| Heat Rate Bonus (natural gas) | $31,500/BTU/Kwh (LHV) | No |
| Schedule Bonus* (Substantial Completion) | $96,000 per day maximum | 25% of Net Revenues per day |
| Output Liquidated Damages (natural gas) | $800/kw*** | 12.5%**** |
| Heat Rate Liquidated Damages (natural gas) | $63,000/BTU/Kwh (LHV) | 12.5% |
| Schedule Liquidated Damages | $63,000/day for Substantial Completion of a Unit, to a maximum of $189,000/day** | 12.5% |

*This Schedule Bonus is in addition to any schedule bonus payable to SWP under the SWP Thermal Island Equipment Supply Contract which, pursuant to Article 4.3 hereof, shall be paid directly by Owner to SWP.

**In the event Substantial Completion has been achieved for one Unit, Contractor's obligation pursuant to this Article 5.3.3 shall not exceed one hundred and twenty-six thousand dollars ($126,000) for any one Day, and in the event Substantial Completion has been achieved for two Units, Contractor's obligation pursuant to this Article 5.3.3 shall not exceed sixty-three thousand dollars ($63,000) for any one Day. No credit shall be given for fractional days.

***In the event that a Unit fails to meet the Acceptance Criteria for the Power Augmentation Functional Test (as defined in Exhibit C) on or before the date of

Final Completion, Contractor shall pay to Owner liquidated damages in the amount of $275/kW for each kW of net electrical output that such Unit is short of the applicable Acceptance Criteria as demonstrated during the Power Augmentation Functional Test. Contractor's liability for liquidated damages under Section 5.3.3 for shortfalls in net electrical output during the Power Augmentation Functional Test (as defined in Exhibit C) shall be limited to one million two hundred fifty thousand dollars ($1,250,000) per Unit (three million seven hundred fifty thousand dollars ($3,750,000.00) in the aggregate)).

****Including Power Augmentation Functional Test liquidated damages.

5.3.4.1. Liquidated Damages for performance shall be calculated as described in Exhibit C and using the Liquidated Damage amounts in the above table.

5.3.4.2. Bonus payment for performance shall be calculated as described in Exhibit C, Article 5.3.3 herein, and using the Bonus payment amounts in the above table.

## PART II – THE WORK PROCESS

## ARTICLE 6. COMMENCEMENT OF WORK

6.1. <u>Notice to Commence Engineering.</u>

Notice to Commence Engineering was issued on April 25, 2001.

6.2. <u>Notice to Proceed.</u>

Notice to Proceed was issued on April 25, 2001.

6.3. <u>Conditions for Contract Execution.</u>

The following conditions shall be satisfied at the time of Contract execution to the extent required to support commencement of Work (with a reasonable expectation that conditions not necessary to the commencement of Work shall be satisfied in time to support the Milestone Schedule):

a.   Any insurance required by Article 18 to be obtained by Owner shall be in effect;

b.   Owner shall have access to the Site;

c.   Owner shall have obtained, with the assistance of Contractor as needed, all Governmental Approvals that are the responsibility of Owner and necessary for commencement and planned progress of engineering and construction;

      d.      Proof of financing by way of a letter from Owner's lenders or other reasonable written documentation; or alternatively, a guaranty from Owner's parent is in place in the form attached hereto as Exhibit H.

### ARTICLE 7. INSPECTION

**7.1. Right of Access.**

Owner and such other persons identified by Owner, shall have the right, upon reasonable notice, at all times during performance of the Work to inspect the Work, the Facility and any item of Equipment, material, design, engineering, service or the workmanship associated therewith, whether at the office, subcontractor office, Facility Site or at the point of significant fabrication. Owner's rights to inspect under this Article 7.1 shall include, but not be limited to, work packages, design reviews, detailed engineering and procurement schedules; manufacturing schedules; compliance with specification; workmanship; dimensional tolerances; production tests; production inspections; assembly of components; panel inspection and testing; or witnessing testing of Equipment at any stage of design, procurement, production or manufacture at Contractor's works or to verify that the Equipment conforms to the specified requirements of this Contract.

**7.2. Observation of Tests.**

Owner and such other persons identified by Owner shall have the right to observe all witness tests of the Equipment, Work and the Facility as set forth in Exhibit C. Contractor shall provide Owner a schedule of such witness tests. Contractor shall use Reasonable Efforts to provide any such party who has requested in writing to observe any such test with at least five (5) Days prior notice of such witness test.

**7.3. Deficient Work.**

Owner shall have the right to reject any portion of the Work that does not meet the standard of performance set forth in Article 3.1.2. Upon such rejection and if applicable before such portion of the Work is covered so as not to be able to be reviewed during a subsequent

inspection, Contractor shall remedy, at its sole cost and expense, all conditions giving rise to such rejection and provide evidence to Owner that the remedy is complete.

7.4. No Acceptance.

Any rights asserted by Owner under this Article shall in no way affect or reduce Contractor's obligations under this Contract and shall not be deemed to constitute an acceptance by Owner with respect to such Work.

## ARTICLE 8. COMMISSIONING AND MECHANICAL COMPLETION

8.1. Commissioning Period.

Contractor recognizes and acknowledges that Owner has committed to a Commissioning Period for each Unit of no fewer than seventy (70) Days starting from Initial Fire and subject to the conditions of Section 9.3 of the SWP Thermal Island Equipment Supply Contract. If Contractor provides written notice to SWP pursuant to Section 9.3.1(d) of the SWP Thermal Island Equipment Supply Contract, Contractor shall promptly provide a copy of such written notice to Owner.

8.2. Mechanical Completion Defined.

Mechanical Completion shall occur with respect to each Unit and the entire Facility. Unless specified otherwise, "Mechanical Completion" shall refer to Mechanical Completion of each Unit and the entire Facility collectively. Mechanical Completion means when, except for minor items of Work that would not affect the safety and/or performance or operation of the Unit and/or Facility such as painting, landscaping, redundant Equipment and so forth,

    a.    all materials and Equipment for the Unit and/or the Facility have been installed in accordance with the plans and the Scope Book, calibrated, loop checked and checked for alignment, lubrication, rotation and hydrostatic and pneumatic pressure integrity;

    b.    all systems required to be installed by Contractor have been installed and tested at significant loads;

c.    the systems have been flushed and cleaned out as necessary;

d.    all the Equipment and systems have been fully operated in a safe and prudent manner at nominal ratings on natural gas and have been installed in a manner that does not (i) void any Subcontractor Equipment, system or other warranties or (ii) violate any Applicable Law; and

e.    all systems necessary for power generation are ready to commence testing and operations in automatic mode, including the CEMS (Permanent).

8.3. Punchlist.

A list of the uncompleted items shall be established and mutually agreed upon by Owner and Contractor prior to Mechanical Completion, as may be mutually amended from time to time prior to Final Completion. The Punch List shall include all deliverables through Final Completion, including those listed in Article 10.

8.4. Process.

Contractor shall deliver to Owner a written Notice of Mechanical Completion not less than ten (10) Days prior to the date Contractor expects Mechanical Completion for a Unit or the Facility to occur. At a time designated by Owner and within seven (7) Days of Owner's receipt of such written Notice, Owner and Contractor shall complete a joint inspection of the Facility, and Contractor shall deliver its proposed Punch List to Owner. Thereafter (i) Owner shall as expeditiously as possible, but in no event longer than three (3) Days, deliver either its written acknowledgment that Mechanical Completion has been achieved or a written Notice listing any failure to achieve Mechanical Completion and (ii) Owner and Contractor shall expeditiously attempt to reach agreement upon the Punch List. Upon mutual agreement that Mechanical Completion has been achieved Contractor may commence the Performance Tests for the Unit or the Facility. Without mutual agreement, Contractor may nevertheless proceed with the Performance Tests at its own risk.

ARTICLE 9. PERFORMANCE TESTS AND SUBSTANTIAL COMPLETION

9.1. <u>Conduct of Facility Tests.</u>

Contractor shall cause Performance Tests to be performed in accordance with mutually agreed Performance Test Procedures to be prepared by Contractor, and acceptable to Owner, in accordance with Exhibit C. Any costs of special test instrumentation or additional costs related solely to the performance of tests, other than the cost of items to be provided by Owner under this Contract, shall be borne by Contractor. Contractor shall furnish reasonable advance Notice to Owner and Independent Engineer (at least ten (10) Days) prior to the commencement of Performance Tests and deliver test reports after each Performance Test, including unsuccessful tests and re-tests, as provided in Exhibit C.

9.2. <u>Process.</u>

9.2.1. <u>Correction of Defects, Re-Run of Facility Tests.</u>

At any time during and promptly after completion (whether or not successful) of the Performance Tests (or any re-run of such tests under this Article), Contractor shall advise Owner in writing of any defects and/or deficiencies in the Unit or Facility or in its performance that were discovered or observed during such tests. Contractor shall, as a Cost of the Work, correct such defects and deficiencies and promptly provide Notice to Owner certifying to such correction, specifying the measures taken and, if such defects or deficiencies require re-running of those tests, setting forth the date on which the Unit or Facility will be ready for the respective deficient Performance Tests to be re-run. Subject to Article 9.5, such tests shall thereafter be re-run promptly and the procedure set forth in this Article shall be repeated until all Performance Tests have been satisfactorily completed and all such defects and/or deficiencies have been corrected.

9.3. <u>Substantial Completion.</u>

Substantial Completion shall be achieved for each Unit and the entire Facility. All performance related requirements of Substantial Completion shall be satisfied while maintaining

compliance with all Emissions guarantees (except that Liquidated Damages for delays in achieving Substantial Completion (Unit and Facility) shall not be payable by Contractor during the period of time and to the extent that (i) Contractor produces a cure plan in not more than fifteen (15) days from the date Substantial Completion (Unit or Facility) would have otherwise occurred but for the failure to pass the Noise Test and (ii) Contractor passes the Noise Test in accordance with the cure plan implementation schedule as approved by the Government Authority, but only so long as the Unit or Facility is not prevented from operating at any time by the Government Authority and with all Equipment tuned and operating in a normal generating condition. Unless specified otherwise, "Substantial Completion" shall refer to Substantial Completion of each Unit and the Facility collectively. Substantial Completion for a Unit and the Facility is defined below.

9.3.1. Substantial Completion on a Per Unit and Facility Basis.

Substantial Completion shall occur on a per Unit and Facility basis.

9.3.4.1. In order to accomplish Substantial Completion for a Unit, (a) Mechanical Completion has occurred and is continuing for the Unit ; (b) the Unit must have simultaneously achieved the Minimum Standard for Net Electrical Output and Minimum Standard for Net Heat Rate through a Net Electrical Output Test and a Net Heat Rate Test performed during a Unit Reliability Test; (c) the Unit must have satisfied the requirements of the Unit Reliability Test; (d) the Unit must have passed (i) the Noise Test and (ii) AGC Test; (e) the CEMS (Permanent) must have qualified as a CEMS (Certifiable); and (f) an EPA-Stack Test must have been successfully completed as determined by a qualified independent third party, in each case with the Unit tuned and operating in a normal operating configuration with all safety and pollution control equipment properly operating. Performance Test requirements and acceptance criteria are provided in Exhibit C.

9.3.4.2. In order to accomplish Substantial Completion for a Facility, (a) each Unit must have achieved Substantial Completion; (b) Mechanical Completion has occurred and is continuing for the Facility and (c) the Facility must have successfully passed (i) the Facility Capability Test, (ii) the Balance Of Plant Capability Test and (iii) the Facility Noise Test, in each case with the Facility tuned and operating in a normal operating configuration with all safety and pollution control equipment properly operating. Performance Test requirements and acceptance criteria are provided in Exhibit C. Additionally, in the event that Unit(s) under Owner's control are not made available to commence and complete the Balance of Plant Capability Test and Facility Capability Test, the Substantial Completion Date Guaranteed (Facility) shall be extended by the additional time which elapses until such Unit(s) are made available; provided, however, if

the delay in Unit availability exceeds ninety (90) Days, the Balance of Plant Capability Test and Facility Capability Test shall be excused as a condition of Substantial Completion (Facility), Owner shall make the Unit(s) available for performance of the test following Substantial Completion (Facility), and successful completion of the Facility Capability Test shall become a requirement of Final Completion. Such extension of the Substantial Completion Date Guaranteed (Facility) shall not extend the Date Certain.

### 9.3.2. Turnover of Unit.

Upon achieving the Operations Turnover Date for a Unit, Contractor shall turn care, custody and control thereof over to the Owner. Shared Facilities sufficient to conduct normal commercial operations of the Facility shall be turned over with the first Unit. Shared Facilities sufficient to conduct normal commercial operations of the subsequent Unit(s) shall be turned over simultaneously with such Unit on the Operations Turnover Date for such Unit.

### 9.4. Notice of Substantial Completion.

Promptly after successful completion of the Performance Test of a Unit and/or the Facility in which, in Contractor's judgment, all of the conditions of Substantial Completion have been satisfied, Contractor shall issue to Owner a Notice of Substantial Completion, which shall include copies of relevant test report(s) in reasonable detail and which shall set forth the date upon which the conditions of Substantial Completion were satisfied. Within five (5) Business Days after receipt of the Notice of Substantial Completion, Owner shall respond to Contractor in writing and either accept or reject such Notice of Substantial Completion. If the Notice of Substantial Completion is rejected, Owner shall identify any deficiencies, which shall be promptly corrected by Contractor. Contractor shall then reperform Performance Tests, if necessary, and resubmit a Notice of Substantial Completion to Owner. The date of Substantial Completion shall be the date upon which the Notice of Substantial Completion, in proper form and with all necessary documentation, is delivered to Owner.

### 9.5. Continuing Effort to Achieve Performance Guarantees.

If Substantial Completion shall have occurred at levels of performance less than those specified in the Performance Guarantees, Contractor shall (i) undertake remedial measures to cause, as promptly as is practicable, achievement of the Performance Guarantees or, (ii) if after using its Reasonable Efforts to meet the Performance Guarantees, Contractor reasonably determines that no further Reasonable Efforts will improve the Facility performance, cease Work and pay the appropriate Performance Liquidated Damages as set forth in Article 5.3.3.  For purposes of calculating Performance Bonuses and Performance Liquidated Damages subsequent to Substantial Completion, Net Electrical Output and Net Heat Rate of each Unit shall be demonstrated by conducting a four (4) hour Performance Test simultaneously for all Units.

### ARTICLE 10. FINAL COMPLETION

10.1. Final Completion.

Final Completion of the Facility shall be defined to occur on the date on which:

a.   Mechanical Completion has occurred, and there has been no change in circumstances that would be inconsistent with a condition of Mechanical Completion;

b.   Substantial Completion has occurred for all Units and the Facility;

c.   all Punch List Items have been completed;

d.   the Functional Tests have been successfully performed;

e.   "as-built" drawings listed in Exhibit A, Scope Book, including a topographic survey and geotechnical survey of the Facility Site on which there shall be designated the location of Contractor's starting reference point, as provided by a physical marker at such location on the Facility Site overhead view maps showing evacuation routes, and emergency equipment locations, such as locations of eyewashes/showers, Hazardous Waste or Materials spill kits, fire extinguishers, fire hoses, first aid related equipment, and fixed fire suppression/detection equipment, have been delivered to Owner;

f.   all specifications, test data and information specified in the Contract have been delivered to Owner;

g.    Contractor has furnished Owner with: (i) a release of Contractor's lien rights, subject to such exceptions or reservations as may be reasonably acceptable to Owner; (ii) Contractor's certification that all claims for payment for labor and materials for which Contractor is responsible in connection with the Work have been paid or satisfied, subject to such exceptions or reservations as may be agreed; (iii) copies of waivers or releases of lien rights given by Subcontractors that have furnished more than One Hundred Thousand Dollars ($100,000) of goods and/or services for the Facility individually or in the aggregate, and (iv) Notice of all outstanding claims of Contractor or any Subcontractor that may affect Owner or the Facility;

h.    any special tools purchased by Owner for the Facility's permanent Equipment have been delivered to Owner in acceptable condition and all replacement spare parts which have been used by Contractor out of Owner's stock have been purchased and delivered to Owner free and clear of liens;

i.    all Contractor's personnel, supplies, equipment, waste materials, rubbish, and temporary facilities have been removed from the Facility Site, except as Owner agrees may be needed for ongoing obligations;

j.    Owner has received from Contractor all information requested for Owner's final fixed asset records with respect to the Facility;

k.    either (i) all the Performance Tests have been completed that satisfactorily demonstrate achievement of all of the Performance Guarantees with the Units operating singly and simultaneously, or (ii) Contractor has paid all applicable Performance Liquidated Damages;

l.    Contractor has paid all applicable Delay Damages;

m.    Contractor has delivered in satisfactory form all permits, licenses and approvals required to be obtained by Contractor;

n.    Contractor has delivered all specifications and drawings (as hard copy and, as agreed by Owner and Contractor, as CADD files), including test data and reports, warranty administration program documents, and other technical information required hereunder for Owner to start-up, operate and maintain the Facility;

o.    Contractor has delivered all operations, maintenance, and manufacturer recommended spare parts lists which shall include pricing and manuals and all instruction books;

p.    Contractor has performed all other provisions of and delivered all items required by this Contract, including Punch List Items, as amended to include those additional items discovered during any Facility tests, in a manner reasonably satisfactory to Owner except that if any Punch List items have not been completed when the other prerequisites to Final Completion have been satisfied, Owner may nevertheless make the final payment, but may withhold an amount from such payment equal to twice the reasonable value of such remaining items, such withheld amount in excess of actual costs to be paid as such remaining items are completed;

q.    the CEMS (Certified) has been installed and is fully operational; and

r.    the Facility is capable of operating in compliance with all governmental requirements throughout the Net Electrical Output Control Range, as defined herein, and during all load changes as set forth in the SWP Thermal Island Equipment Supply Contract.

10.2. Notice of Final Completion.

Promptly after Contractor determines that Final Completion of the Facility has occurred, Contractor shall issue to Owner a Notice of Final Completion including all Performance Test reports. Thereafter, Owner shall expeditiously, but in any event no later than ten (10) Business Days after receipt of such Notice, deliver either its written acknowledgement that Final Completion has been achieved or written Notice listing any failure to achieve Final Completion, in which latter event Owner and Contractor shall expeditiously remedy such failure and perform such activities as are required to achieve Final Completion. The date of Final Completion shall be the date that the Notice of Final Completion is delivered to the Owner.

10.3. Extension of Final Completion Date Guaranteed.

In the event Substantial Completion Date (Unit) has been achieved for all three (3) Units within twelve (12) months of the Substantial Completion Date Guaranteed (Facility), the Final Completion Date Guaranteed may be extended for a period not to exceed six (6) months, by Notice from Contractor, which Notice shall evidence concurrence of SWP. During the period of any such extension Contractor shall pay to Owner, on a monthly basis, an extension fee for each Unit equal to $0.35 per day for each kilowatt by which the Net Electrical Output of any

Unit fails to satisfy the Net Electrical Output Guaranteed and $32.00 per day for each Btu/KWh by which the Net Heat Rate of any Unit fails to satisfy Net Heat Rate Guaranteed while maintaining compliance with Emissions Guarantee. In such event Contractor shall not be entitled to any degradation adjustment for the extension period for purposes of final Performance Tests.

10.4. Failure to Achieve Final Completion.

If Final Completion has not occurred by the Date Certain, Contractor shall deliver all items required to be delivered and pay all amounts required to be paid pursuant to Article 10.1.

## ARTICLE 11. WARRANTY

11.1. Warranties.

Contractor warrants that it shall perform the Work in accordance with the standards of performance set forth in Article 3.1.2 of this Contract.

11.2. Remedies.

Upon proper Notice received from Owner during the Warranty Period, Contractor shall, in a timely manner:

a. Design and Engineering: Re-perform correctly any engineering or design Work that does not satisfy all of the warranties set forth in this Article and perform or cause to be performed remedial construction work or rework that is required to effect such re-performed engineering or design Work;

b. Construction: Re-perform or cause to be re-performed any construction Work that does not satisfy any warranty set forth in this Article;

c. Equipment and Materials: Take such steps as may be necessary to repair or replace any Equipment, component of Equipment or materials which do not comply with any warranty set forth in this Article; and

d. Damage Repair: Be responsible for all "in and out" costs necessary to determine the need for, and to secure access to and perform, remedial Work including cost of parts, consumable materials,

equipment and labor.  Contractor shall also be responsible for and replace or repair any damage to the Facility or Owner's property caused by any warranty failure or resulting from Contractor's warranty Work hereunder.

11.3. Warranty Period.

Each Unit and the Facility shall include a limited warranty against defects through the earlier of (i) twelve (12) months from Substantial Completion of the Unit and (ii) thirty (30) months after delivery of the Unit. All work not included in a Unit shall include a limited warranty against defects through twelve (12) months from the date of Substantial Completion of the Facility.  The limited warranty shall exclude wear and tear and any operation not in accordance with Contractor's or Subcontractors' written instructions.  Warranty repair work shall be rewarranted for one year from completion of such work up to two years from Substantial Completion of the Facility.

Contractor shall obtain, maintain and assign at the conclusion of the Equipment Warranty Period hereunder performance and workmanship warranties to Owner for the SCR system.  The warranty against defects in design, materials and workmanship shall  include (a) for the SCR and CO catalysts, coverage for a period which expires thirty six (36) months after the date on which the first exhaust gas is introduced into the applicable catalyst or forty eight (48) months after Delivery, whichever first occurs, and (b) for the SCR and CO equipment other than the catalysts, coverage for a period which expires twenty four (24) months after Substantial Completion (Unit) or thirty six (36) months after Delivery, whichever first occurs.  The performance warranty with respect to the guaranteed NOx and CO emissions levels shall be as set forth in the SWP Thermal Island Equipment Supply Contract.

11.4. Pinch Point Warranty.

Contractor warrants that during normal operations the Net Electrical Output of the Units and the Facility (over the range of ambient conditions set forth in Exhibit A experienced

during the first year following Final Completion of the Facility) shall not be limited by properly functioning Balance of Plant equipment or Shared Facilities for a period of one (1) year from Final Completion of the Facility.

### 11.5. Notice.

Owner shall deliver Notice of any alleged failure to satisfy any warranty within thirty (30) Days after actual discovery thereof by Owner. Failure to give such Notice during such thirty (30) Day period shall not relieve Contractor of its warranty obligations and liabilities except to the extent Contractor is prejudiced by such failure. Any such Notice of deficiency or defect shall state with reasonable specificity the reasons supporting Owner's belief concerning the alleged deficiency or defect. In the event that, during the Warranty Period, the Facility has ceased operating or is materially and adversely affected in its operations (as demonstrated by either a ten percent (10%) decrease in Net Electrical Output or ten percent (10%) increase in Net Heat Rate compared to the most recently measured levels) as a result of the alleged defect or deficiency, Contractor shall respond to any such Notice as soon as possible but in any event within twenty-four (24) hours after receiving such Notice. In all other circumstances, Contractor shall commence remedial efforts as soon as practicable after receipt of the aforementioned Notice, but in no event later than twenty (20) Days thereafter.

### 11.6. Assignment of Subcontractor Warranties.

Contractor shall cause all Subcontractor warranties to be assignable to Owner or Owner's designee. Contractor shall assign to Owner all unexpired Subcontractor warranties and shall deliver any amounts withheld by Contractor from such Subcontractor upon the expiration of the Warranty Period, or earlier at Owner's request.

### 11.7. Extended Major Equipment Warranties.

Contractor shall obtain and, at the conclusion of the Warranty Period, shall assign to Owner, to the extent offered by Subcontractors at no additional cost to Contractor or Owner, Subcontractor warranties on Major Equipment which have an expected duration of longer than twelve (12) months from Substantial Completion of the Facility. To the extent such extended warranties are available only at a cost to Contractor or Owner, Contractor shall so advise Owner and Owner shall elect whether or not to purchase such extended warranty. Such purchase of an extended warranty shall be set forth in a Change Order.

11.8. Warranty Enforcement Remedies.

If Contractor does not use its Reasonable Efforts to commence and diligently pursue a remedy within the time specified in Article 11.5, with the exception of the SWP warranty enforcement time period contained in Section 5.2.2 of the SWP Thermal Island Equipment Supply Contract, Owner, after Notice to Contractor, may perform or have performed by third parties the necessary remedy and Contractor shall be liable for all reasonable costs (including overhead), charges and expenses (including transportation and expediting fees) incurred by Owner in connection with such remedy. To secure Contractor's performance of its obligations pursuant to this Paragraph, Contractor shall, as a condition precedent to Substantial Completion of the Facility, deliver to Owner a letter of credit in the form of Exhibit W in the amount of five percent (5%) of the Balance of Plant portion of the Contract Price, against which Owner may draw through a period not to exceed twenty-four (24) months following Substantial Completion.

11.9. No Implied Warranties.

THE WARRANTIES SET FORTH IN THIS ARTICLE 11 ARE EXCLUSIVE AND EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES. CONTRACTOR MAKES NO WARRANTIES OR REPRESENTATIONS OF ANY KIND WHATSOEVER BEYOND THOSE EXPRESSLY SET FORTH HEREIN, WHETHER STATUTORY, ORAL, WRITTEN,

EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR PURPOSE, RELATING TO DESIGN OR OTHER SERVICES, OR TO EQUIPMENT OR MATERIALS, TO BE SUPPLIED BY CONTRACTOR UNDER THIS CONTRACT TO THE FACILITY.  CONTRACTOR SHALL HAVE NO RESPONSIBILITY FOR DAMAGE CAUSED TO THE WORK BY ORDINARY WEAR AND TEAR, UNINTENDED USE, MISUSE OR ABUSE.

## PART III -- THE PAYMENT PROCESS
### ARTICLE 12. CONTRACT PRICES

12.1. Amount.

As full compensation for the Work (including any royalties or licenses related to any inventions related to the Work), Owner shall pay Contractor, in accordance with the payment provisions of Article 13, the Contract Price of $529,187,200, consisting of $265,982,200 for Balance of Plant services and $263,205,000 for the SWP Thermal Island Equipment Supply Contract.  This Contract Price shall be adjusted per Article 14.

12.2. Other Compensation.

In addition to the Contract Price, Owner shall pay to Contractor:  (i) reimbursement for Contractor's payments of certain taxes as provided in Article 2.5, (ii) Schedule Bonuses as provided in Article 4.3, and (iii) Performance Bonuses as provided in Article 5.3.2.

12.3. Reserved

12.4. Cost of the Work.

The term Cost of the Work shall mean actual costs (including pre-approved cancellation costs), which Contractor shall mitigate to the extent possible, reasonably paid by Contractor in the proper performance of the Work less any Credits Available for Offsetting under Article 12.6. The Cost of the Work shall include only the items set forth in this Article 12.4.

*Labor Costs.* Wages of construction workers directly employed by Contractor to perform or directly supervise the construction of the Work at the site or at off-site workshops. Craft labor costs shall be at rates not higher than the standard paid at the place of the Facility except with prior written consent of the Owner.

Wages and salaries of Contractor's engineering and design, supervisory or administrative personnel engaged at home office, factories, workshops, site or on the road, in design, project control, safety, project management, procurement, project accounting, materials management, expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

Actual costs paid by Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements. For personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, such costs are based on wages and salaries included in the Cost of the Work under Article 12.4. These costs are allowed as a multiplier of 31% of actual cash straight time salaries. All other overheads shall be paid as a lump sum of Twelve Million Dollars ($12,000,000), paid pro rata per the Balance of Plant milestone payments; this is included in the Contract Price.

*Subcontract Costs.* Payments made by Contractor to Subcontractors in accordance with the requirements of the subcontracts and by Owner under the SWP Thermal Island Equipment Supply Contract, except for bonuses directly paid by Owner to SWP.

*Costs of Materials and Equipment including those provided by Contractor Incorporated in the Completed Construction.* Actual costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

Actual costs of materials described in the preceding paragraph in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess on-site materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

*Costs of Other Materials and Equipment, Temporary Facilities and Related Items.* Actual costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, utilities, machinery, equipment, and hand tools not customarily owned by construction workers, that are provided by Contractor at the site and fully consumed in the performance of the Work; and costs (less salvage value) of such items if not fully consumed, whether sold to others or retained by Contractor. Cost for items previously used by Contractor shall mean fair market value.

Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers that are provided by Contractor at the site, whether rented from Contractor or others, and costs of transportation, installation, minor repairs, fuel, oil and gas, replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

Actual costs of removal of debris and snow from the site. Actual costs of startup first fills, chemicals, startup spare parts, vendor technical representatives required to support construction and startup, not covered in the other Contracts.

Actual costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges. Telephone service at the site and reasonable petty cash expenses of the site office.

That portion of the reasonable expenses of Contractor's personnel paid while traveling in discharge of duties connected with the Work if not included elsewhere.

Actual storage costs of materials and equipment suitably stored off the site at a mutually acceptable location, if approved in advance by the Owner.

*Miscellaneous Costs.* That portion of insurance, bond premiums and/or letter of credit fees that are directly attributed to this Contract.

Sales, use or similar taxes imposed by a governmental authority that are related to the Work which have not been passed through for direct payment by Owner or billed to Owner by Contractor as allowed under this Contract.

Fees and assessments for the building permit and for other permits, license and inspections for which Contractor is required by this Contract to pay.

Fees of laboratories for tests required by this Contract.

Deposits lost for causes other than Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in this Contract.

Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably paid by Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld.

Expenses paid in accordance with Contractor's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, if approved by the Owner and if not included elsewhere.

*Other Costs and Emergencies.* Other costs paid in the performance of the Work and to the extent approved in advance in writing by the Owner.

Costs due to emergencies paid in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

Overtime premiums and other incentives paid to attract and retain the project site direct labor workforce.

Third party cancellation costs paid by Contractor.

Bonuses paid by Contractor to Subcontractors.

Prior to Final Completion, warranty administration and "in" and "out" costs, provided, however, that Contractor shall request reimbursement of such "in" and "out" costs from the applicable equipment supplier and shall credit any such proceeds to Owner.

Costs resulting from a Force Majeure event, subject to a Change Order for one hundred percent (100%) of the costs to which SWP is entitled under the SWP Thermal Island Equipment Supply Contract and fifty percent (50%) of all other costs as an adjustment to the Contract Price.

Deductibles paid by Contractor pursuant to any Builders' Risk and Contractor procured Marine Cargo insurance policy placed pursuant to this Contract.

12.5. Costs Not Allowed for Calculating Actual Cost Performance.

The actual Cost of the Work shall not include:

Salaries and other compensation of Contractor's officers and personnel stationed at Contractor's principal office or offices other than the site office not directly associated with the work.

Expenses of Contractor's principal office and offices other than the site office, except as they may be expressly included in Article 12.4.

Overhead and general expenses, except as they may be expressly included in Article 12.4.

Contractor's capital expenses, including interest on Contractor's capital employed for the Work.

Rental costs of machinery and equipment, except as specifically provided in Article 12.4.

Any cost not specifically and expressly described in Article 12.4.

Costs resulting from fraud, gross negligence, violation of Governmental Approvals and Governmental Rules, other illegal actions, fines, permit violations, or patent infringement.

Indemnification costs paid for items not reimbursable under Article 12.4.

12.6. <u>Credits Allowed for Offsetting.</u>

Credits offsetting actual costs are (i) collection of funds from the resale of surplus materials, (ii) collection of proceeds from the resale of equipment purchased, (iii) collection of proceeds from insurance, (iv) recovery of funds from claims and other actions, (v) recovery of funds from Subcontractor backcharges including, but not limited to, Liquidated Damages, (vi) recovery of funds from rebates from Subcontractors, (vii) bonus, and (viii) warranty cost recovery.

12.7. <u>Accounting Records</u>

The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit from time to time upon three (3) Business Days' Notice and copy, the Contractor's records, books, correspondence, instructions, drawing, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 13. INVOICING AND PAYMENTS

13.1. <u>Payments to Contractor.</u>

For the performance of the Work, the Owner shall pay to the Contractor the amounts set forth in Article 12, at the times and in the manner specified in this Article. Payments shall be due the later of the 25th of the Facility Month or twenty (20) Days after receipt of invoice and progress report ("Payment Date").

13.1.1. <u>Monthly Payments.</u>

Contractor shall be paid monthly for all Balance of Plant milestones achieved in accordance with the Milestone Payment Schedule, Exhibit B2, attached. Contractor shall only be paid upon completion of a Balance of Plant milestone, and shall not receive pro rata or partial payment for incremental work toward achieving such Balance of Plant milestone. The cumulative amounts of all payments to Contractor shall not exceed the amounts set forth in the Maximum Monthly Payment Schedule, Exhibit B1, attached. For each Balance of Plant milestone achieved, Contractor shall accrue on a bookkeeping basis a Contingency Margin as set forth in Exhibit B2.

13.1.4.1. Contractor shall receive monthly requests for payment from SWP based on SWP achievement of SWP milestones (*i.e.*, excluding claims and backcharges)

pursuant to the provisions of the SWP Thermal Island Equipment Supply Contract. Contractor shall review such requests by SWP and shall approve those amounts, including release of retention, which Contractor determines are due SWP under the SWP Thermal Island Equipment Supply Contract. Contractor shall then forward to Owner the approved amounts of SWP's request for payment to Owner within a mutually agreed time period. Thereafter, Owner shall pay, or cause to be paid, directly to Contractor and SWP, respectively, those amounts approved by Owner.

### 13.1.2. Adjustments to Monthly Payments.

Not less than each three (3) months, the Parties shall meet and agree upon adjustments to be made to conform payments to the actual Cost of the Work with respect to Balance of Plant up to the lesser of (i) the amount set forth in the Maximum Monthly Payment Schedule and (ii) the cumulative value of all Balance of Plant milestones achieved through such date. To the extent that payments to Contractor for all Balance of Plant milestones achieved exceed the actual Cost of the Work, Contractor shall, subject to Owner's discretion, (i) remit such excess payments within thirty (30) Days, (ii) receive a credit from Owner for all or part of such excess payments up to a cumulative maximum of thirty-one million dollars ($31,000,000), or (iii) provide a deduction from the amount of the next monthly invoice in an amount up to the amount of the overpayment. To the extent that the actual Cost of the Work for Balance of Plant exceeds payments, Owner shall remit such incremental amount to Contractor within thirty (30) Days, up to the lesser of (a) the accrued and undrawn Contingency Margin or (b) the maximum amount set forth in the Maximum Monthly Payment Schedule to date minus the amounts paid (as previously adjusted) for Balance of Plant milestones achieved to date. See Exhibit V for examples.

### 13.2. Bonuses.

Schedule Bonuses, if any, shall be paid as specified in Article 4.3. Performance Bonuses, if any, shall be paid as specified in Article 5.3.2.

### 13.3. Progress Report and Invoice.

In the event Owner reasonably determines that Contractor has not met any critical path milestone in accordance with the Milestone Schedule during the applicable period, Owner may withhold an amount equal to the value of the milestone not completed until such milestone is completed. In the event of any such withholding, Owner shall deliver to Contractor, not later than the due date for the payment from which such withholding is being made, a written Notice specifying the basis for the withholding. Owner shall pay to Contractor such withheld amount, without interest, on the succeeding Payment Date(s) when and to the extent Contractor demonstrates and Owner reasonably agrees that the milestone has been achieved, subject to deduction in the amount of five percent (5%) of the withheld amount for each month of delay in completion of the overdue Work. The deducted amount shall be paid to Contractor, without interest, on the first Payment Date following Contractor development and successful implementation of an acceptable recovery schedule that presents at least (a) a discussion of problems encountered during the period in which the milestone was not achieved and the remedies effected or planned and (b) a schedule and description of the Work to be performed to recover any delay in achieving the milestones set forth in Exhibit F, and assuring development of Substantial Completion by the Substantial Completion Date Guaranteed (Unit or Facility, as applicable). In the event that a recovery schedule is not developed and successfully implemented, all such withheld amounts shall be applied to the payment of Delay Damages or other amounts which become due and payable by Contractor to Owner under this Contract. Owner may also withhold from payments due to Contractor amounts anticipated to be due as Delay Damages pursuant to Article 4.1.

In the event Contractor owes Owner any amounts under this Contract and such amounts remain unpaid fifteen (15) Days after Notice thereof, Owner may offset such amounts from any payment hereunder.

Contractor shall not cease or reduce the rate of its performance under this Contract on account of any withholding under this Article.

13.4. <u>Interest on Late Payments.</u>

Except for amounts withheld pursuant to Article 13.3 above and otherwise allowed pursuant to this Contract, any amount that is not paid by the date such amount is due shall accrue interest for each day from the due date until the date of receipt at the lesser of (a) an annual rate equal to two percent (2%) above the rate per annum announced from time to time by Morgan Guaranty Trust Company, New York as its prime commercial interest rate, or (b) the maximum rate permitted by applicable law.

13.5. <u>Final Payment.</u>

The final payment shall be due on the first Payment Date following Final Completion of the Facility and will include any remaining balance of the Contract Price.

## PART IV - EXCEPTIONAL EVENTS
## ARTICLE 14. CHANGES TO THE WORK PROGRAM

14.1. <u>Definition of Change.</u>

The following shall be a Change under this Contract:

a.   Any addition to, deletion from, or modification of the Facility or any of the Work that is agreed upon by the Parties;

b.   Any Force Majeure event to the extent such Force Majeure event affects a Party's ability to perform in accordance with this Contract, provided that any Force Majeure event shall be a compensable change for one hundred percent (100%) of the costs to which SWP is entitled under the SWP Thermal Island Equipment Supply Contract and fifty percent (50%) of all other costs as an adjustment to the Contract Price, and may be cause for a time extension as well (in addition to all Force Majeure costs being reimbursed as Costs of the Work);

c.   Delay or other demonstrable adverse impact on Contractor's activities under this Contract resulting from acts or omissions causing material interference or delay by Owner or Owner's other contractors (unless and to the extent also the result of acts of Contractor or Subcontractors), excluding any delays or other demonstrable adverse impact on Contractor's activities resulting from Owner's reassignment of the SWP Thermal Island Equipment Supply Contract under Article 3.1;

d.   Owner's direction to temporarily commence Commercial Operations of any Unit prior to the applicable Substantial Completion Date Guaranteed (Unit);

e.   Owner's suspension of Work pursuant to Article 16;

f.   A Change of Law; or

g.   Any Performance Test interruption as described in Exhibit C. This change will not alter Performance Guarantees.

**14.2.  Site Conditions.**

Contractor has inspected the Facility Site and surrounding locations, including both surface and borings for subsurface conditions, in accordance with Prudent Industry Practices, and is familiar with the physical requirements of the Work; accepts them for such performance; and shall not be entitled to any Change with respect thereto. However, previously unidentified archeological finds which materially impact the cost or schedule of the Facility will be a basis for a Change.

**14.3.  Adjustment Due to Changes.**

To the extent that a Change affects Contractor's ability to perform the Work, or the time or cost (including reduction thereof) of doing so, or any other obligation under this Contract, Contractor or Owner shall be entitled to an equitable adjustment as appropriate to the Contract Price, the Schedule Guarantee, Performance Guarantees, and/or such other parts of this Contract as may be affected by such Change. The burden of proving entitlement to relief shall be on the Party requesting the Change Order.

**14.4.  Change Orders.**

Upon Owner request, Contractor shall submit to Owner a written proposal for executing any changed Work (when fully executed, a "Change Order"), and an estimate, in accordance with Exhibit G, detailing any impact upon affected provisions of this Contract that Contractor contends would result from the proposed Change.  Except to the extent immediate action may be required by an emergency threatening life or property, Contractor shall not take action to effect or respond to a Change except pursuant to a written Change Order.  Owner may proceed to implement any Change Order pursuant to Article 14.4.1 or 14.4.2, as Owner may determine in its discretion.  If the Owner requests a Change but decides not to proceed with the Change, then Contractor's costs associated with preparing its written proposal shall be a Cost of the Work.

14.4.1. By Agreement.

For Changes established pursuant to an agreed price, Owner shall execute the Change Order authorizing such adjustments as shall have been agreed to by Owner and Contractor.  Each Change Order shall show all agreed-upon adjustments to the Contract Price, the Schedule Guarantee, the Performance Guarantees, and/or such other parts of this Contract as may be affected by such Change.

14.4.2. By Owner Directive.

Owner may direct Contractor to implement a Change generally consistent with the scope of the Work, in which event Contractor shall proceed with such Change, and shall be reimbursed for its costs as provided in Exhibit G.  Contractor shall maintain complete and accurate records of the costs incurred due to the Change, which records shall be subject to audit by Owner; provided, however, that the adders and multipliers set forth in Exhibit G shall not be subject to audit.  Contractor shall weekly submit detailed summaries of costs sustained due to Changes implemented pursuant to this Article.

14.5.  Effect on Performance of Work.

Nothing in this Article shall be construed to relieve Contractor of any responsibility for the Work pending agreement on the terms of any Change Order.

14.6.  Contractor Changes for Convenience.

Contractor shall obtain written approval by the Owner for Contractor initiated Changes for convenience.

14.7.  Change Order Calculation.

Change Orders shall adjust the Contract Price. Any Change Order or other costs charged to a Owner on a lump sum or time and material basis shall be calculated based on an overhead cost of zero percent (0%), provided that Contractor shall be permitted to bill direct labor costs including home office costs associated with the change.  When the aggregate amount of Balance of Plant Change Orders exceeds ten million dollars ($10,000,000), a four percent (4%) overhead charge shall apply to Balance of Plant Change Orders thereafter.  A five percent (5%) fee shall be added to the cost of each Balance of Plant Change Order.

### ARTICLE 15. FORCE MAJEURE

15.1.  Excuse from Performance for Force Majeure.

Each Party shall be excused from performance and shall not be considered to be in default with respect to any obligation hereunder, if, and to the extent that, its failure of or delay in performance is due to an event of Force Majeure, and both Parties shall use Reasonable Efforts and due diligence to mitigate such an event.

15.2.  Notice of Force Majeure.

If either Party's ability to perform its obligations hereunder is affected by an event of Force Majeure, such Party shall promptly, but in any event within fifteen (15) Days of learning of such event, give Notice to the other Party stating the nature of the event, its potential effect and the anticipated duration thereof, and any action being taken to avoid or minimize its effect.