The Shaw Group, Inc., Stone &
Webster, Inc., and Stone & Webster
Michigan, Inc.,

American Arbitration Association

Case No. 16 110 Y 00242 04

Claimants

(Part Two:  Harquahala Project)

v.

New Harquahala Generating Company,
LLC,

Respondent

# DECISION AND AWARD WITH RESPECT TO THE HARQUAHALA PROJECT

## June 30, 2006

**TABLE OF CONTENTS**

1. Selection of the parties' proposals ................................................ 3

2. Background of the Project and this proceeding ................................ 5

3. Reasoning with respect to the selections between proposals on the technical issues ........ 6

    A. Shaw Claim:  Extended Overhead Costs – Fuel Shut Off ............ 6

    B. Shaw Claim:  Extended Overhead Costs – Switchyard Trips ........ 8

    C. Shaw Claim:  Additional TFA Costs .................................... 9

    D. Shaw Claim:  Demineralized Water .................................... 11

    E. Owner Claim:  Legal and Environmental Costs ...................... 13

    F. Owner Claim:  Electrical Termination Errors ......................... 16

    G. Owner Claim:  Switchgear Fire ........................................ 18

    H. Owner Claim:  Condensate Pump Motor Repairs .................... 20

    I. Owner Claim:  Excessive alarms ....................................... 22

    J. Owner Claim:  Cooling Tower Acid Piping Replacement ........... 23

    K. Owner Claim:  Turbine Building Crane Repairs and Certification .... 24

    L. Owner Claim:  Cooling Tower Cable Tray Covers .................. 26

    M. Owner Claim:  Vapor Compression Erosion .......................... 28

4. Owner Claim:  Delay damages ................................................ 30

    A. Determinations of the durations of Shaw's delays ................... 30

        1. Start dates of delays .............................................. 30

        2. Ending dates of delays ........................................... 30

        3. Table of contentions as to delay durations ................... 31

        4. Discussion as to delay durations ............................... 32

        5. Findings as to delay durations .................................. 33

    B. Determinations as to Liquidated Damages ........................... 34

        1. Discussion .......................................................... 34

        2. Findings as to Liquidated Damages ........................... 35

    C. Determinations as to Actual Damages ................................ 35

        1. Discussion .......................................................... 35

        2. Findings as to Actual Damages ................................ 37
           (a) With respect to the Owner's net lost revenue claim ...... 37
           (b) With respect to the Owner's excess fuel costs claim ..... 38
           (c) With respect to the Owner's claim for loss of benefits ... 39

    D. Ultimate Finding on the Owner's Claim for Delay Damages ...... 39

5. Rulings on pending motions .................................................... 39

6. Award ............................................................................ 39

The Shaw Group, Inc., Stone & Webster, Inc., and Stone & Webster Michigan, Inc.,

American Arbitration Association

Case No. 16 110 Y 00242 04

                Claimants

(Part Two:  Harquahala Project)

v.

New Harquahala Generating Company, LLC,

                Respondent

### DECISION AND AWARD WITH RESPECT TO THE HARQUAHALA PROJECT

We the undersigned arbitrators, designated to serve in this matter pursuant to Article 24.2.2 of the EPC Contract between the parties dated August 13, 2001 and the American Arbitration Association Construction Industry Arbitration Rules, having duly heard the evidence and arguments of the parties with respect to the Harquahala Project portion of this proceeding, hereby render the following Award:

### 1. SELECTIONS OF THE PARTIES' PROPOSALS

The Arbitration Agreement provides that "In rendering the arbitration award, the arbitrators will select between the parties' last proposals, choosing the proposal that the arbitrators find more reasonable and appropriate." Accordingly, the arbitrators have made the following selections as to each of the issues upon which the parties have made "baseball" proposals:

| ISSUE # | SHAW/S&W | Positions Owner Value | Shaw Value | Tribunal Award |
|---------|----------|------------------------|------------|----------------|
|         |          |                        |            | TO SHAW |
| 1 | Contract Balance | 21,854,216 | 22,095,000 | 22,095,000 |
|   | Letter of Credit Refund | 18,811,000 | 18,811,000 | 18,811,000 |
|   |  |  |  |  |
| 2 | Extended Overheads - Fuel Shut Of | 425,000 | 3,500,000 | 3,500,000 |
|   |  |  |  |  |
| 3 | Extended Overheads - Switchyard Trips | 0 | 107,000 | 107,000 |
|   |  |  |  |  |
| 4 | Additional TFA | 0 | 1,800,000 | 1,800,000 |
|   |  |  |  |  |
| 5 | Demineralized Water | 0 | 84,000 | 84,000 |
|   |  |  |  |  |
| 6 | Interest |  |  |  |
|   | **Totals** | **41,090,216** | **46,397,000** | **46,397,000** |

| | OWNER COUNTERCLAIMS | Owner value | Shaw value | Award<br>To Owner |
|---|---|---|---|---|
| 1 | Delay Damages | 23,000,000 | 8,000,000 | 8,000,000 |
| 2 | Legal & Environmental Costs | 108,665 | 150,000 | 108,665 |
| 3 | Electrical Termination Errors | 814,409 | 500,000 | 814,409 |
| 4 | Switchgear Fire | 108,448 | 0 | 0 |
| 5 | Condensate Pump Motor Repairs | 51,756 | 0 | 0 |
| 6 | Excessive Alarms | 46,794 | 0 | 0 |
| 7 | Cooling Tower Acid Piping Replacement | 57,150 | 0 | 0 |
| 8 | Turbine Bldg Crane Repairs & Certification | 116,916 | 58,000 | 58,000 |
| | | | | |
| 10 | Cooling Tower Cable Tray Covers | 35,621 | 0 | 35,621 |
| 11 | Vapor Compression Erosion | 100,000 | 0 | 0 |
| | | | | |
| 12 | Man Lift | 65,174 | 65,174 | 65,174 |
| | | | | |
| | Totals | 24,504,933 | 8,773,174 | 9,081,869 |
| | Net to Shaw | 16,585,283 | 37,623,826 | 37,315,131 |

The Arbitration Agreement further provides that "the decision or award must be in writing and must contain findings of fact on which it is based." Counsel have agreed that the words "findings of fact on which it is based" can be interpreted by the arbitrators as meaning "a reasoned explanation of the basis on which the selection of proposals was made." The Arbitration Agreement further provides that in making its decision or award "the arbitration panel shall be bound by all provisions of this Contract," and that they "shall have no authority or power to enter an award which is in conflict with any of the provisions of this Contract."

Accordingly, in the following sections of this Award the tribunal will provide, first, background information as to the parties in interest, the contested issues, and the procedural

history of the case; and second, the tribunal's reasons for the selection it made on each technical issue which remained contested at the end of the hearings. A third section of the Award deals with the complex issue of Delay Damages. A fourth section disposes of a Motion that had not previously been ruled upon.

## 2. BACKGROUND OF THE PROJECT AND THIS PROCEEDING

Claimants:

The Shaw Group, Inc., Stone & Webster, Inc., and Stone & Webster Michigan, Inc.

Initial Respondent:                          Substituted Respondent:

Harquahala Generating Company LLC (Arizona)    New Harquahala Generating Company LLC

In this Award, for simplicity and convenience, the Claimants will be referred to simply as "Shaw," and the Respondent will be referred to simply as "Harquahala" or "the Owner."

Nature of the case and issues:

Shaw originally claimed for refund of Liquidated Damages collected by the Owner, contract balances, and cost of extra work and delays; Harquahala counterclaimed for Liquidated Damages, delays, defective work, etc.

Shaw contested the Liquidated Damages as punitive, and initially asked for a bifurcation and early determination of this issue. Since the issue appeared to be primarily a law issue, except that some factual data on market conditions would be relevant to the issue, the parties were asked to brief and argue the issue. On January 15, 2005 counsel submitted briefs on the legal standards to be applied in evaluating the validity of Liquidated Damages, and on February 10 oral argument was held.

After oral argument the arbitrators determined that there were likely issues of fact that would be relevant and material to a determination of Liquidated Damages. They therefore ruled that they would not exclude evidence of Actual Damages, and would give each party the opportunity to present at the hearing whatever claims they had with respect to Liquidated Damages and Actual Damages, regardless of whether measured prospectively or retrospectively.

Accordingly, hearings were held on the issues involved in the Covert project, resulting in an Award in that case dated as of December 15, 2005.

Hearings, post-hearing briefing and oral argument on the issues involved in the Harquahala project were held between January 10 and April 10, 2006. On May 5, 2006 the parties reached agreement on the disputed contract balance.

This Award will address all issues raised by the parties with respect to the Harquahala project, except the subject of Interest, which will be dealt with as to both Covert and Harquahala at a later date.

### 3. REASONING WITH RESPECT TO THE SELECTIONS BETWEEN PROPOSALS ON THE TECHNICAL ISSUES

The Table in Section 1 of this Award lists all of the issues that were submitted to the Tribunal. The parties were in agreement on the amounts to be awarded on Shaw's claims as to Contract Balance and Letter of Credit Refund, and the Owner's claim as to Man Lift. In this section of the Award the Tribunal will summarize its reasoning as to its selections between the parties' respective proposals on 13 contested technical claims: four Shaw claims, and nine Owner claims. The tenth contested Owner claim, Delay Damages, will be dealt with separately in Section 4 of this Award.

**A. Shaw Claim: Extended Overhead Expenses – Fuel Shut Off**

Background:

The EPC Contract in Article 2.6 required the Owner to "provide ... fuel ...in quantities typical for normal plant start-up, normal operation and Performance Tests."

Shaw claims that the Owner unilaterally and without prior notice to Shaw, stopped supplying fuel gas to the Project on December 31, 2003, and as the result of this shut off Shaw suffered extended overhead costs from January 1 through September 30, 2004 of $6,215,642, to which Shaw has added markups that bring the total claim to $6,787,481.

Shaw's specific contentions are:

a. The EPC Contract required the Owner to supply fuel to the Project.

b. The Owner had no contractual right to shut off the fuel.

c. The Owner shut off the fuel for purely economic reasons.

d. Shaw could not complete its testing and punch list obligations without fuel.

e. From January 1 through September 30, 2004 there was complete uncertainty as to when fuel would be restored, yet Shaw was obligated to continue to work on the Project.

f. The Owner also shut off fuel to other plants it was building at the same time.

g. The Owner's action in shutting off fuel constituted a breach of the contract.

The Owner acknowledges that it was required to supply fuel gas in quantities for normal plant startup, normal operation, and performance testing. It contends, however, that Shaw was

taking too long, was using more than a normal amount of fuel gas, and did not have an acceptable plan to complete all work in an efficient and cost-effective manner.

Discussion:

It appears clear from the evidence that the decision to cut off fuel was made by the Banks that were financing the project, based on the high cost of fuel and the significant losses that the Project and the Banks would incur by continuing operations at the time.

While the parties disagreed as to whether Shaw's use of fuel prior to the shut off was excessive, it does not appear that the Owner employed any of the change order or suspension or termination or dispute resolution procedures provided under the Contract and available to it for justifying or resolving the problems that would inevitably arise from shutting off fuel to the Project.

It also appears clear from the evidence that the Owner refused to commit to resume supplying fuel to the Project unless Shaw agreed to comply with various extra-contractual conditions, and when Shaw refused to agree to those conditions, the Owner never made a firm commitment to resume fuel supply.

During the period after the fuel was shut off, there was continuing uncertainty as to when the supply of fuel would resume. The Owner from time to time would give indications that fuel supply would be resumed, but gave no definite information upon which Shaw could base its work plans. During this period Shaw had to do what it could to fulfill its obligation to continue whatever work it could perform on the Project, despite the lack of fuel which was necessary for the performance of material portions of that work. Initially Shaw kept its site crews intact, but as the period of uncertainty continued, Shaw reduced its staff, at the same time retaining key experienced personnel who could respond if fuel supply was resumed. During this period the failure of the Owner to reveal its plans for restoring fuel supply, and the need for Shaw to be prepared for a quick restart of its site operations if fuel supply was restored, made it difficult for Shaw to make decisions about demobilizing personnel and laying up equipment.

There is no question that Shaw incurred extraordinary overhead costs during this period of uncertainty. The nature of the uncertainty made it difficult for Shaw to quantify precisely which of its costs during the period were due directly to the unavailability of fuel, and which were incurred for other reasons. Shaw presented extensive records of the overhead costs it incurred throughout the period of uncertainty. These costs were criticized and disputed by the Owner's expert Robert Dieterle. Shaw contended that upon a reexamination of all of its overhead costs it eliminated those categories that would not normally be recoverable as extended overhead costs.

Findings:

1. The Owner's decision to shut off fuel gas supply during construction and testing was, under the circumstances, a breach of contract.

2. The Owner unreasonably failed to keep Shaw informed of its plans and its proposed schedule for resumption of fuel supply.

3. Shaw was entitled to recover its reasonable additional overhead costs occasioned by the uncertainty created by the Owner.

4. The Owner has proposed that Shaw's damages be $425,000. Shaw has proposed that its damages be $3,500,000. Under the circumstances, the Panel finds that Shaw's proposal of $3,500,000 is more reasonable and appropriate.

## B. Shaw Claim: Extended Overhead Expenses – Switchyard Trips

The Owner was contractually responsible for the supply of permanent electric and backfeed power to the Project as well as the on-site distribution system. On three different occasions during 2003 units that were under construction were shut down because of trips that occurred in switchyards that serviced the Harquahala Project.

Shaw made claims for schedule relief or extended overhead costs because of delays to its Work resulting from each of the switchyard trips:

First trip: PAR Switchyard trip: Unit 3 suffered a four day delay from June 5 to June 9, 2003 due to an Owner fault in the PAR switchyard. The critical path for completion of Unit 3 ran through Urgent Technical Advisory (UTA) 009. UTA 009 did not begin until July 7, and was constrained by SWPC resources. Shaw claimed an extension in contract time, but did not claim a compensable delay.

Second trip: First Hassayampa Switchyard trip: Unit 2 was tripped off line for half a day on July 28, 2003 by a force majeure lightning strike. Shaw claimed a one day extension in contract time for this event. Because the Settlement Agreement in 9.d (iii) precluded any recovery for increased costs during the first 5 days of a force majeure delay, Shaw did not claim a compensable delay.

Third trip: Second Hassayampa Switchyard trip: On August 5, 2003, all three Units were impacted by a faulty relay in the Owner's equipment. Units 1 & 2 were running at the time. Unit 1 was delayed six days, while restoring steam chemistry. Unit 2 was also delayed by steam chemistry issues for two days and Unit 3 was delayed one day during steam blows. Shaw initially defined this trip as a force majeure event, which, because of the five-day limitation on force majeure events, would have limited Shaw to one day of compensable delay damages; accordingly Shaw claimed compensable overhead expenses of $107,498 for this one day. During the hearing, Shaw modified its position to claim that this event was an Owner-caused delay, and claimed that there was a nine day Owner-caused delay. However Shaw did not submit a change order request for any damages beyond the $107,498 originally claimed.

The Owner contends:

a. The Settlement Agreement at 9.d (ii) bars change orders which are not pre-approved by the Owner, and Shaw had not submitted change order requests for any of the switchyard trips.

b. The amount claimed for overhead expenses of one day is not justified.

Findings as to Shaw's claims for extended overhead compensation:

1. The PAR switchyard trip was an Owner-caused delay, but it did not result in a critical path delay to Shaw because a succeeding event, UTA 009, which controlled the Unit 3 schedule, would have precluded an earlier completion even if the switchyard trip had not occurred.

2. The first Hassayampa trip was a force majeure event which caused a one-day critical path delay to Unit 2. Shaw would be entitled to a one-day extension in time but would not be entitled to compensation for extended overhead because of the Settlement Agreement exclusion of the first five days of a force majeure delay.

3. The second Hassayampa trip was an Owner-caused delay impacting Unit 1 by six days, Unit 2 by two days, and Unit 3 by one day. Shaw submitted a claim for one day of extended overhead compensation in the amount of $107,498, but did not submit a change order request for any additional amount.

4. The matter of Shaw's entitlement to a few days of Contract Time extensions because of switchyard trips was not directly addressed by the parties, but would not have materially impacted the award of delay damages had it been addressed.

5. The Owner has proposed damages of $0. Shaw has proposed damages of $107,000. The tribunal finds that Shaw's proposal of $107,000 is more reasonable and appropriate.

## C. Shaw Claim: Additional TFA Costs

Background:

Shaw claims that it is entitled to be reimbursed for technical field assistance or advice (TFA) costs which it paid to SWPC, in addition to TFA costs for which it had already been reimbursed by the Owner. The Owner claims that the allowance of hours for which Shaw would be reimbursed, plus an additional change order for additional TFA services which the Owner has paid, were adequate to pay for all TFA costs required to complete work on the Project, and that any additional TFA hours claimed by Shaw were caused by Shaw delays or delays which pre-dated the Settlement Agreement. Shaw originally claimed costs of $2,957,100, but at the hearing reduced that claim to $2,335,000.

Relevant Contract provisions:

The Owner's contract with Siemens Westinghouse (SWPC), the turbine supplier, which the Owner assigned to Shaw, provided at Appendix VI for an allowance of 140 man-months

(26,560 man-hours) of technical field assistance (TFA) support for installation, start up and commissioning of SWPC equipment.

The EPC Contract at 3.2.4.4 provided that "In the event that Contractor and Owner reasonably determine that the need for Technical Field Assistance from SWP exceeds commitments provided for in the SWP ... Contract, then Owner shall issue an Change Order for such additional assistance."

The Settlement Agreement at Article 9 (f) provided: "Notwithstanding any provision of the Contract to the contrary ... Contractor and Owner acknowledge and agree as follows ... (i) any costs for SWPC technical field advice ("TFA") that exceed the amount allowed by Change Order No. CN-063 shall be reimbursed by Owner on a time and material basis except if such TFA costs are attributable to delays (i) occurring as a result of acts or omissions occurring before execution of the Settlement Agreement, or (ii) caused by the Harquahala Contractor, in which case the Harquahala Contractor shall be responsible for such TFA costs."

Discussion:

Even though the EPC Contract contemplated payment of additional TFA costs "in the event that Contractor and Owner reasonably determine" the need for such additional costs, the Settlement Agreement provided that "Notwithstanding any provision of the Contract to the contrary" any additional TFA costs "shall be reimbursed by Owner," with the only exceptions being delays (i) occurring as a result of acts or omissions occurring before execution of the Settlement Agreement, or (ii) caused by the Contractor.

At the hearing Shaw relied in part on its proposed Change Order CN-00093 which claimed reimbursement for $1,810,173 of additional TFA costs representing services which occurred after the May 15, 2003 Settlement Agreement in order to complete the Unit 3 performance tests prior to September 28, 2003. The evidence showed that Shaw actually paid this amount to SWPC. Shaw also sought to recover other TFA costs, but the only documentation for payment of those costs to SWP was Shaw's contention that they were paid for in a general settlement which Shaw made with SWP.

The Owner contended that all the additional TFA hours in Shaw's claim were the result of Shaw's own inefficiencies and delays. Although the evidence on this point was conflicting, Shaw was able to trace the additional hours claimed in CN-00093 to specific required work events on the Project. The Owner's representative Witzing testified that he would not be surprised to learn that some of the NEG and LS Power representatives believed that Shaw was entitled to some addition additional TFA costs. The Panel notes that the total hours and amounts requested by Shaw were less than the hours and amounts of TFA services that were allowed by the Award on the comparable Covert Project.

Findings:

1. The Owner's defenses against this Shaw claim rely on two exceptions contained in the relevant language of the Settlement Agreement. It is well established that a party seeing to take

advantage of an exception in a contract bears the burden of proving the facts necessary to bring its defense within the exception. Under the evidence in the case, the Owner has not carried the burden of showing that the claimed costs fell under either of the exceptions referred to in the Settlement Agreement.

2. Shaw's final proposal on this issue is for reimbursement of $1,800,000, the amount that the Owner internally listed as a potential liability in its "Preliminary Final" Completion Account. The Owner's final proposal is $0. The tribunal finds that Shaw's offer of $1,800,000 is more reasonable and appropriate.

**D. Shaw Claim: Demineralized Water**

Background:

Demineralized water is required for a number of construction and commissioning activities, including water for steam production, power augmentation operations and the daily start-up cycle. The EPC Contract in Article 2.6 required the Owner to "provide ... raw water (including potable and demineralized) ... in quantities typical for normal plant start-up, normal operation, and Performance Tests."

During July 2003 Shaw was conducting various start up operations on Units 1 and 2, and during a brief period these operations included simultaneous steam blows which required substantial quantities of demineralized water.

On July 18, 2003 Shaw gave notice to the Owner that during the following week it would need demineralized water in amounts greater than those that the Owner currently had available. When the Owner refused the request, Shaw brought in its own temporary system to provide demineralized water for its operations.

Discussion:

Shaw contends that the Owner failed to meet its contractual obligation to furnish demineralized water, and seeks recovery of some $84,000 of costs in obtaining a temporary supply of such water.

The Owner objected to the claim on several grounds, and informed Shaw that if Shaw submitted a change order request it "will be rejected." The Owner contended:

a. Two weeks before Shaw's request the Owner had a temporary demineralized water tank available for Shaw's use which, after notice to Shaw, the Owner had removed, without objection from Shaw.

b. The Owner's permanent system for producing demineralized water had been installed by the time of Shaw's request, and was sufficient to provide all demineralized water required for Shaw's needs.

d. Shaw's simultaneous commissioning of two units was the result of Shaw falling behind schedule, so Shaw's need for increased supplies of demineralized water was not "normal."

e. The Owner also based its rejection of Shaw's request on the ground that under the Settlement Agreement Shaw has the obligation to finish the project to meet the design objectives as stated in the Contract and Scope Book with no additional change orders (unless directed in writing by the Owner, or caused by a force majeure event).

Shaw disputes that the Owner's permanent system was adequate for Shaw's needs, and that the fact that changes in the schedule resulted in simultaneous steam blows on two units did not amount to use in excess of normal requirements.

At the hearing Ray Hanley testified that the Owner's Mike Fulcher had done "some monitoring" of the amount of Shaw's use of demineralized water during the period when it had the temporary demineralized water trailers, and Mike Fulcher had told Hanley that his evaluation "from what he saw" was that Shaw didn't "necessarily" need water in excess of the capabilities of the Owner's system. Shaw's witness Sharp testified in opposition that the Owner's permanent system was insufficient to keep up with Shaw's requirements for simultaneous steam blows, "and I don't think anybody ever had any illusions that it would."

It appears from reading the Owner's internal correspondence at the time Shaw made its request for additional demineralized water that the Owner based its refusal in part because the Owner was unhappy about Shaw's past requirements for demineralized water, which the Owner based on Shaw's poor scheduling.

Findings:

1. The fact that Shaw's schedule for one of the units slipped to the point where it was necessary to have simultaneous steam blows for a short period of time was the kind of normal circumstance that can occur on any similar construction project, and therefore Shaw's requirements for demineralized water during this time fell within normal and typical requirements, which the Owner was required by the Contract to meet.

2. Although the testimony was conflicting as to whether or not the Owner's permanent demineralized water facilities were adequate to take care of Shaw's needs during this period, the direct testimony of Ray Sharp support's Shaw's view, while the opposing testimony on behalf of the Owner was based on hearsay testimony about an evaluation by Mike Fulcher, who did not testify. The tribunal further notes that the permanent water facilities were designed for plant operations and not necessarily for construction testing and commissioning operations.

3. The Owner objects to this claim and other claims on the ground that under the Settlement Agreement "Shaw has the obligation to finish the project to meet the design objectives as stated in the Contract and Scope Book with no additional change orders." The tribunal does not read the Settlement Agreement as conclusively barring any additional compensation to Shaw arising out of construction operations. The determination of whether

Shaw is entitled to an equitable adjustment in a particular instance is made by the tribunal, based on all of the facts and circumstances, including Contract requirements.

    4. The Owner has proposed damages of $0. Shaw has proposed damages of $84,000. Under the circumstances the Panel finds that Shaw's proposal of $84,000 is more reasonable and appropriate.

### E. Owner Claim: Legal and Environmental Costs

Background:

    During Shaw's operation and testing of the facility, Maricopa County, through MCESD, issued various Notices of Violation (NOV's) and Compliance Status Notifications (CSN's) relating to Air Permit No. V99015 issued by MCSD to the Owner. It is undisputed that the Owner ultimately paid $108,665.00 to MCESC in fines to resolve the various violations.

    In addition to the sums paid MCESD, the Owner paid $157,100.00 to URS, an environmental consulting firm retained by the Owner to manage the NOV's and CSN's. The Owner also paid $83,194.00 to a law firm for legal services allegedly related to the NOV's and CSN's and another $56,879.00 to Kleinfelder, an environmental firm, to audit the Owner's compliance with environmental laws.

    The Owner alleges Shaw is liable for both the settlement sum paid to MCESD and all related costs totaling $405,838.00. However, the Owner in its closing argument stated it is only seeking the $108,665.00 paid in settlement of violation fines.

Relevant Contract Provisions:

    § 3.1.2 of the EPC Contract, Standard of Performance, and the attached Exhibit of Definitions provides that all work will be performed and prosecuted in compliance with "Applicable Law." Applicable Law is defined as "Governmental Approvals and Governmental Rules" and these terms are further broadly defined to include any "authorization," "approval," "permit," "certification," etc. This section further requires the Contractor to comply with all requirements of the Environmental Control Program.

    § 4.4 of the EPC Contract, Emissions Guarantee, requires the Contractor to "work in good faith to rectify the nonconformance" (i.e., failure to achieve the Emissions Guarantee) by either ". . . (a) fixing the defective condition, (b) purchasing emission credits (if available), and/or (c) seeking to change permit conditions."

    Exhibit M to the EPC Contract, Environmental Control Plan Contents, provides, in part, that ". . . noncompliance items will be corrected as soon as possible and will be brought to the attention of the Environmental Management Team."

    § 11.1 of the EPC Contract, Warranties, provides that the Contractor warrants that the Work will be performed in accordance with the performance standards of § 3.1.2.

§ 11.2 of the EPC Contract, Remedies, provides, in part, that the Contractor "Take such steps as may be necessary to repair or replace any Equipment, component of Equipment, or materials which do not comply with any warranty set forth in this Article;".

§ 25.3, Remedies Exclusive, provides, in pertinent part, that "It is the intent of Owner and Contractor that the rights and remedies expressly afforded by this Contract for failure to satisfy obligations arising hereunder are the sole and exclusive remedies of the Parties for failure to satisfy these obligations, notwithstanding any remedy otherwise available at law or in equity. . .".

§ 25.4 of the EPC Contract, Consequential Damages, provides that with the exception of liquidated damages or certain payments to third parties, neither party will be directly liable to the other for any special, indirect, incidental, or consequential loss or damage whatsoever; . . ."

Discussion:

The evidence shows that approximately 48 NOV's were issued to the Owner by Maricopa County. It further appears that 9 were rescinded, some were of questionable validity, and a good number (allegedly 17) were issued during startup, shutdown, or load swings. The Owner concedes that if emission levels were exceeded during startup, shutdown, or load swings, that Shaw would have no liability, at least under § 4.4, but does not concede that Shaw could still not be liable under the § 11.1 warranty of the § 3.1.2 standards of performance. The Owner further contends that Shaw breached its performance duties, which breach resulted in the violation fines and related costs, for which Shaw should be liable.

Shaw counters by first contending, as a preliminary matter, that the Owner's claim for reimbursement of environmental fines and related costs are consequential, indirect, and incidental damages barred by § 25.4 of the EPC Contract. Shaw further contends that even if the damages are not consequential, but direct, the Owner's claim is barred because specific provisions of a contract take precedence over general provisions. In this regard, Shaw argues that its emission commitments are not found in § 3.1.2 of the EPC Contract (the general provision upon which the Owner relies), but are found in the specific Emissions Guarantee of Exhibit D to the EPC Contract. Shaw further submits that the emission guarantees were not applicable during start up, shutdown, or load swings, which Shaw contends account for 17 of the 48 total NOV's leaving only 17 in issue since 9 were rescinded and 5 were so questionable that R.W. Beck could not verify their propriety or basis.

As additional defenses, Shaw argues that the $108,665.00 claim asserted by the Owner for environmental violations was part of a global un-itemized settlement which the Owner negotiated with MCESD regarding Air Permit No. V99015. Therefore, Shaw contends that there is no legal basis for the Owner to seek recovery under any theory for amounts paid in an unallocated "global settlement." Shaw argues this was exactly the same basis upon which the Owner argued that Shaw could not recover any TFA amounts that Shaw claimed were paid as part of Shaw's settlement with MHIA during the Covert hearing and that the case law cited by the Owner in Covert is just as applicable to Shaw's defense in Harquahala.

Lastly, Shaw contends that § 4.4 and Exhibit M provide that the remedies for non-compliance with environmental requirements fail to include any provision for damages, but simply state what action Shaw is required to take to rectify or correct non-compliant items. Shaw argues that the exclusive remedies provision set forth in § 25.3 of the EPC Contract therefore limits Shaw's obligations to the Owner to the remedial actions required under § 4.4 or Exhibit M, as opposed to damages.

Findings:

1. Section 3.1.2 of the EPC Contract clearly mandates that Shaw perform and prosecute all work in accordance with "Applicable Law." Applicable Law includes Governmental Approvals and Governmental Rules which include any authorization, approval, license, permit, application, certification, etc. under the Exhibit of Definitions. Under § 11.1 of the EPC Contract, Shaw warranted to perform its Work in accordance with the standards set forth in § 3.1.2. This requirement would appear to include compliance with the Air Permit the Owner obtained from Maricopa County.

2. Consequential damages are barred by § 25.4 of the EPC Contract, which includes ". . . any special, indirect, incidental, or consequential loss or damage whatsoever . . .". As a general rule, consequential damages can be recovered only if they are reasonably foreseeable and can be traced solely to a breach of contract independent of any collateral enterprise or undertaking by the claimant. The Panel is inclined to believe the fines levied by Maricopa County for valid NOV's would be a reasonably foreseeable and contemplated Owner damage as a direct consequence of any breach by Shaw of the allowable emission levels (except during startup, shutdown, or load swing). However, URS and Kleinfelder expenses might be barred by § 25.4 of the EPC Contract. The tribunal finds that further consideration of this issue is not necessary due to the other findings on this claim as set forth below.

3. The specific emission provisions of the EPC Contract as found in § 4.4 and Exhibit M take precedence over the general performance requirements found in § 3.1.2.

4. The $108,665 fine that was paid by the Owner to MCESD was a global settlement of all NOV's and CSN's, and a global unallocated settlement cannot be used as evidence that a particular claim was paid (i.e., fines for which Shaw might be liable under one theory or the other).

5. Section 25.3 of the EPC Contract is applicable to this issue, and the Owner's exclusive remedies for Shaw's non-compliance with any environmental requirements are set forth in § 4.4 of the EPC Contract and Exhibit M, both of which require correction of non-compliant items, but do not provide for damages.

6. The Owner's proposed damages are $108,665, a lesser amount than Shaw's proposal of $150,000. However, under the circumstances, the Panel finds that the lesser amount proposed by the Owner is more reasonable and appropriate.

### F. Owner Claim: Electrical Termination Errors

<u>Background:</u>

(1) CEIDS

This dispute initially related to the question of whether Shaw was obligated to provide hard copy redlined as-built drawings for cable and wiring, or whether Shaw met its obligation to provide documentations of record-copy conditions by providing its own standard Cable Equipment Instrumentation Database System ("CEIDS"). The Owner ultimately conceded that it would accept the CEIDS system in lieu of full hard copy record drawings. However, the Owner contends that the data base provided by Shaw was inaccurate, incomplete and unreliable, creating serious maintenance and safety issues as well as affecting plant reliability which interfered with the Owner's ability to efficiently troubleshoot problems. Shaw contends that many of the inaccuracies alleged by the Owner resulted either from failure to use the latest updates of CEIDS provided by Shaw, or from tests performed prior to updated entries. Shaw further contends that the Owner also was given redlined termination tickets that would reflect changes in the as-built conditions, and that therefore there was no shortage of adequate records upon which the Owner could rely.

(2) Electrical Defects

The Owner also contends that in addition to having to correct the CEIDS data base, it was required to expend substantial sums to correct extensive amounts of sloppily bundled cabling, inaccurate cutting, labeling, color coding of cables and other improper connections. Shaw denied that the Owner demonstrated any breach of industry standards or practices. Although the Owner introduced numerous photographs purportedly depicting the alleged sloppy, inaccurate and improper wiring, Shaw questioned their credibility and evidentiary value, contending that the Owner failed to establish that the "before" and "after" pictures were of the same items and whether the photographs were taken during construction (i.e., reflecting normal construction conditions) or after Shaw had completed that portion of its work. Shaw further contended that the amount of work and the seriousness of the alleged discrepancies was somewhat exaggerated.

<u>Relevant Contract Provisions:</u>

§ 3.1.2 of the EPC Contract provides in part that all equipment and materials " . . . shall be free from defects, shall conform to the standards of material and workmanship prevailing in the industry, shall be designed to adequately perform the function for which such Equipment was specified . . . and shall be of new and good quality." It further provides that all Work will be in accordance with "Prudent Industry Practices."

The March 14, 2004 Letter Agreement listed the CEIDS system in Attachment One as a defect/deficiency item of Work which would be treated as a warranty item with resolution requiring the Owner and Contractor to develop a plan by March 19, 2004 for identifying errors in the data base and requiring the Contractor to correct all errors by April 16, 2004.

Article 11 of the EPC Contract, covering Shaw's Warranty, provides in 11.2 (c) that Shaw "[t]ake such steps as may be necessary to repair or replace any Equipment or materials which do not comply with any warranty set forth in this Article . . ."

Discussion:

The evidence on these issues was complex and conflicting:

In support of its position, the Owner produced testimony from Ray Hanley and Malcolm Hubbard of various instances in which alleged random tests and other inspections showed inaccuracies between the CEIDS data base and actual installation of the wiring and cabling systems. After Shaw failed to address the alleged defects and deficiencies, the Owner retained Power Maintenance Resources, Inc. ("PMRI") to investigate and repair defective and deficient work. The Owner tendered the Declaration of G.S. "Jake" Hardy, President of PMRI who had 37 years of experience in maintenance and construction services in the electrical power generation and transmission industry. Mr. Hardy described the results of a Phase I investigation in which he identified five categories of alleged discrepancies and stated that 42% of the inspected conditions (1/3 of the system) did not match the CEIDS data. Mr. Hardy further stated that the Phase I investigation and the Phase II repairs of the CEIDS and defective, incomplete and improper wire and cabling work originally performed by Shaw required 9,940.45 man hours of PMRI personnel. The Owner further relied on the Declaration of Oladele Osisami, an instrument controller and electrical technician, relating to the Work he performed while employed by Siemens Westinghouse to correct loose, tangled and/or defective connections to the Siemens systems and equipment. PMRI was not authorized to work on connections to Seimens proprietary systems and equipment. The Owner presented evidence that it spent between $800,000 and $900,000 with PMRI and Siemens for correcting CEIDS deficiencies and cable/wiring defects and omissions.

Shaw presented the witness statement of Anthony Cortese, a 35 year employee of Shaw specializing in the electrical field, whose current position was Shaw's lead senior electrical designer. Mr. Cortese gave his opinion that although the CEIDS system must be updated frequently and regularly to properly reflect field conditions, Shaw, in fact, updated the system promptly throughout the project – even after the Owner shut off the fuel supply. Mr. Cortese further testified that Shaw provided updates regularly as they became available. Mr. Cortese also testified that the Owner had received redlined termination tickets from Shaw that would reflect any changes in the as-built conditions and it appeared uncertain as to whether the Owner was using the most recently updated versions of CEIDS. Shaw also presented testimony from Ray Sharp who stated he believed the Owner-selected field tests of CEIDS were not randomly selected, but were based on recently performed revisions which could not have been updated at the time of the tests.

Findings:

1. A preponderance of credible evidence, after consideration to Shaw's objections to the photographs and the Declarations of Mr. Hardy and Mr. Osisami, leads the tribunal to the conclusion that both the CEIDS system and the electrical wiring and cabling systems failed to

meet the requirements of the relevant contract documents and prevailing industry standards.

2. The inaccuracies and deficiencies in the CEIDS and electrical wiring and cabling posed substantial safety, maintenance, and operational issues which justified the Owner in retaining PMRI and Siemens to make corrections after Shaw failed to do so.

3. The Owner's final proposal on this issue is $814,409. Shaw's final proposal is $500,000. Under the circumstances and the evidence, the tribunal finds that the Owner's proposal of $814,409 is more reasonable and appropriate.

## G. Owner Claim: Switchgear Fire

Background:

On March 30, 2004, the 6.9kV Switchgear in Unit 2 exploded during an apparent release of the lock-out-tag-out procedure (LOTO). This incident occurred approximately two weeks after the Owner had accepted both Mechanical Completion and Substantial Completion and care, custody and control (CCC) of all three units pursuant to the March 14, 2004 Letter Agreement.

On the evening of the explosion, the Owner gave Shaw notice of a warranty claim. Eight days later, Shaw rejected the Owner's notice, stating the Owner had failed to meet the requirements of a warranty notice because it did not state "with reasonable specificity the reasons supporting Owner's belief concerning the alleged deficiency or defect" (§ 11.5 EPC Contract).

The Owner seeks investigative and repair costs of $108,448.00 due to Shaw's alleged breaches of contract.

Discussion:

The Owner contends that the incident was due to Shaw's failure to properly clean the electrical switchgear (including the area behind the "shutters"). Siemens gave the opinion that the most likely cause was foreign matter left on or near the lower disconnects of either the contact carriage or the cell. CWC Consulting and Black & Veatch subsequently investigated and ruled out ferro resonance as a possible cause. Shaw's Ray Sharp suspected the explosion could have been caused by failed electrolytic capacitors, which he said were "notorious" for failing. Both parties agree that the precise cause of the explosion and fire will never be known. It is undisputed that Dielectric tests were not performed prior to energizing the unit.

The Owner contends that Shaw breached the EPC Contract by (1) failing to perform and prosecute this portion of the Work with "Prudent Industry Practices" (§ 3.1.2 EPC Contract), (2) failing to install non-defective electrical switchgear capable of operating as intended (§ 3.1.2 EPC Contract), and (3) breaching its warranty obligation to repair the switchgear after proper notice (§ 11.5 EPC Contract).

The Owner acknowledges that § 11.5 of the EPC Contract states that "Any ... Notice of deficiency or defect shall state with reasonable specificity the reasons supporting Owner's belief

concerning the alleged deficiency or defect." Although the Owner's warranty Notice to Shaw basically only advised Shaw of a fault, explosion and resulting fire in the subject unit, the Owner contends this met the Notice requirements and that Shaw was not justified in failing to honor the warranty claim due to the Owner's failure to identify the "root cause" of the incident. The Owner cites Arizona case law stating that a warranty is intended to relieve the promisee of any duty to ascertain the facts for himself. The Owner also claims that it was Shaw's responsibility to perform the dielectric tests and, further, that there is no evidence that the dielectric testing would have detected the deficiency which caused the explosion.

Shaw contends it is not responsible since (1) the incident occurred after the Owner had taken over CC&C of the unit, (2) the Owner failed to conduct standard safety and maintenance procedures before re-energizing the equipment (i.e., the dielectric testing), (3) the Owner is attempting to hold Shaw liable for an event resulting from an unknown origin which is an attempt to hold Shaw to a legal standard of "strict liability" versus "warranty," and (4) The Owner's Notice was insufficient even if the explosion was due to a warranty issue.

Findings:

1.     The Owner clearly had CC&C of Unit 2 when the switchgear explosion occurred. Malcolm Hubbard testified that the LOTO program was the Owner's responsibility after CC&C. He further testified that the party responsible for clearing the LOTO is responsible for energizing it. Hubbard further testified that the Owner did not perform the dielectric test which was a part of the Siemens Westinghourse pre-energization check procedures.

2.     § 11.3 of the EPC Contract specifically states that "The limited warranty shall exclude wear and tear and any operation not in accordance with Contractor's or Subcontractors' written instructions."

3.     The case law cited by the Owner purporting to relieve the promisee of any duty to ascertain the facts upon which a breach of warranty claim is asserted is found to be distinguishable and, therefore, unpersuasive. *Hoover v. Nielson* relates to a "warranty" of fact made in an affidavit of a grantor in a real estate transaction. A statement of fact, or a so-called "warranty" in an affidavit, appears to be distinguishable from a warranty that design and construction are in accordance with the standards of performance (i.e., Applicable Law and Prudent Industry Practices) as contained in the EPC Contract. The *Albritton v. Coleman Co.* case deals with products liability under Mississippi law. In a products liability case under Mississippi law, a plaintiff claiming breach of an express warranty must "show that the product did not live up to its warranty." Therefore, even if Mississippi law were controlling (which it is not), the Owner failed to present any proof that the Unit 2 switchgear did not live up to its warranty (i.e., Applicable Law or Prudent Industry Practices) in either design or construction, but demonstrated only that an incident occurred causing certain damages and disruptions to use of the unit.

4.     While Shaw's brief cites no case law in response to the "warranty" cases cited by the Owner relating to the requirements of notice for a warranty claim, the Owner's notice was simply a factual statement that the explosion had occurred, without any attempt to state why the Owner believed that the explosion was the result of any defect triggering a warranty claim.

5.    The Owner's allegation that debris was located "behind the shutters" was not substantiated by any convincing evidence. Furthermore, Mr. Olson, the Siemens Westinghouse Manger of Technology, specifically refused to state in his declaration that the location of any alleged debris was, in fact, behind the shutters.

6.    After various expert investigations, the cause of the explosion is acknowledged by both parties to be undetermined. The Owner's proposal on this issue is $108,000. Shaw's proposal is $0. The tribunal considers that Shaw's proposal is more reasonable and appropriate.

## H.  Owner Claim:  Condensate Pump Motor Repairs

Background:

On March 25, 2004, the Owner's employees observed oil leaking from the condensate pump motors. This observation was made approximately 11 days after the Owner accepted care, custody, and control under the Letter Agreement of March 14, 2004. It is undisputed that the oil leaks were discovered by the Owner during its first maintenance check. The Owner issued three "Warrantee Notices" to Shaw on the same date the oil leaks were discovered, specifically stating that the bearing seals and casing seal/joints on each pump needed repair. On April 5, 2004, Shaw acknowledged receipt of the Owner's claims. On April 7, 2004, Shaw in turn gave notice of the warranty claims to its supplier Siemens-Westinghouse who, in turn, inspected the pumps on April 21, 2004 and advised Shaw that they were immediately contacting the manufacturer. On April 22, 2004, Shaw notified the Owner of the various steps it was continuing to take with Siemens-Westinghouse in response to the Warrantee Notices. On April 28, 2004, the Owner pulled the motors for inspection, repair, and replacement. On May 2, 2004, Don Matson of Siemens-Westinghouse wrote directly to the Owner and to Shaw advising that a technical representative from the manufacturer, Hyundai Heavy Industries (Korea), would visit the site on May 5, 2004 to inspect the motors.

Relevant Contract Provisions:

§3.1.2 of the EPC Contract requires Shaw to provide equipment free from defects, in accordance with Prudent Industry Practices and Standards, and designed to adequately perform their specified function.

§ 11.2 of the EPC Contract provides, in part, that Shaw " . . . Take such steps as may be necessary to repair or replace any Equipment, component of Equipment, or materials which do not comply with any warranty set forth in this Article; . . .".

§ 11.8 of the EPC Contract provides, in part, that "If Contractor does not use its Reasonable Efforts to commence and diligently pursue a remedy within the time specified in Article 11.5 (20 days except "emergencies") . . . Owner, after Notice to Contractor, may perform or have performed by third parties the necessary remedy and Contractor shall be liable for all reasonable costs . . .".

§25.3 of the EPC Contract provides, in part, that "It is the intent of Owner and Contractor that the rights and remedies expressly afforded by this Contract for failure to satisfy obligations arising hereunder are the sole and exclusive remedies of the parties for failure to satisfy these obligations, notwithstanding any remedy otherwise available at law or in equity."

Discussion:

The investigation and repairs undertaken by the Owner reveal that the most probable cause of the oil leaks was that the motors were overfilled with oil. Since the oil leaks were discovered by the Owner during its first maintenance inspection, if overfilling of the motors with oil was the cause of the leak, this event most likely occurred before Shaw's transfer of care, custody, and control to the Owner. Shaw does not dispute either the Owner's determination of the most probable cause of the leaks, or that any overfilling occurred while the equipment was in its care, custody, and control.

Shaw acknowledges receipt of the Owner's Warrantee Notices, but contends, in turn, that it promptly made a warranty claim with Siemens-Westinghouse as the vendor of the motors, so notified the Owner, and apprised the Owner of its progress in this regard. However, four days prior to receiving word that the manufacturer's representative from Korea would be on site, the Owner undertook to remove, repair, and replace the motors. Although Shaw acknowledges that the 20 days had technically elapsed during the period when it was required to "commence remedial efforts" following receipt of a Warranty Notice, it argues that since it had commenced and was diligently pursuing a remedy within the 20 day period, the Owner was not authorized to commence "self-help." Shaw further contends that when the Owner removed, inspected and repaired the motors before determining the cause of the oil leak, the Owner incurred costs out of proportion to the problem, constituting a failure to mitigate damages.

Findings:

1. The most likely cause of the oil leaks was overfilling of the motors with oil while the equipment was still in the care, custody, and control of Shaw.

2. Shaw met its obligations to the Owner to commence and diligently pursue a remedy within 20 days after the Owner's Warrantee Notices by timely making demand upon the vendor of the motors to honor the vendor/manufacturer's warranty and by notifying the Owner of its actions. If Shaw had undertaken immediate repair or replacement without notice to the vendor/manufacturer, then Shaw would likely have voided any vendor/manufacturer's warranty.

3. The Owner's Warrantee Notices to Shaw were not an "emergency" notice requiring a response as soon as possible but, in any event, within 24 hours.

4. The Owner failed to carry its burden of proof that the repair costs for which it makes claim were reasonable under the circumstances, resulting in the Owner's failure to mitigate its damages.

5.  The Owner's final proposal is $51,756.00.  Shaw's final proposal is $0.  Under the circumstances and evidence, the Panel considers that Shaw's proposal of $0 is more reasonable and appropriate.

## I. Owner Claim:  Excessive Alarms

Background:

The Owner claims that it is entitled to recover damages from Shaw in the amount of $46,794.00 as costs incurred to remedy excessive alarms resulting from Shaw's breach of the EPC Contract and Shaw's failure to honor its warranty obligations.

Shaw contends that Item 11 in Attachment One to the March 14, 2004 Letter Agreement supersedes all prior contractual obligations of Shaw as to the DCS and any excessive alarms, and that Shaw fully complied with the express resolution obligations contained in the March 14, 2004 Letter Agreement.

Relevant Contract Provisions:

In Paragraph 1 of the March 14, 2004 Letter Agreement, the Owner accepted Mechanical Completion and Substantial Completion of Units 1, 2 and 3 as of that date.  In Paragraph 2 the Owner acknowledged taking over care, custody and control of the three units and limited the Contractor's access to the units, including the control room, to the extent necessary to complete the Work.  The Owner further required Shaw to abide by all of the Owner's procedures with respect to site access, security, scheduling of work and communications, and required Shaw to have work orders approved before obtaining site access and performing any work.

The March 14, 2004 Letter Agreement also identified, in Attachment One, various Mechanical and Substantial Completion defects which the parties agreed to convert to warranty items.  Each warranty item had specific resolution steps by which Shaw was to resolve the particular issue.  Item 11 on Attachment One dealt with excessive alarms and warnings on the DCS system.  The Contractor was to resolve this issue by making a qualified DCS engineer available for a minimum of 30 days after restart of the units to work interactively with Owner's operating personnel in systemically investigating all active alarms.  Thereafter, Shaw was to correct any improper set points or implement changes to rectify other improper conditions.

Discussion:

The March 14, 2004 Letter Agreement clearly was an acknowledgment by both the Owner and Shaw that excessive alarms and warning annunciations were occurring in the facility at that time.  This contention was also supported by the testimony of Malcolm Hubbard and the Declaration of Oladele Osisami.  However, the issue as to whether or not the excessive alarms were defects or otherwise in contravention of the EPC Contract is rendered moot by the March 14, 2004 Letter Agreement in which the parties agreed to treat all MC/SC defects listed on Attachment One as warranty items under Article 11 of the EPC Contract.  Attachment One went further and provided the specific resolution steps with applicable deadlines by which Shaw was

to address each of the items.  The Attachment One resolution for the DCS alarms required the Contractor to make a qualified DCS engineer available for a minimum of 30 days to work "interactively" with the Owner's operating personnel to systematically investigate active alarms. The testimony shows that Shaw made available the technical services of John Sedley, a DCS engineer whose qualifications were never questioned, but who was never allowed by the Owner's personnel to take any action.  Mr. Sharp testified that Mr. Sedley went to the control room early most mornings in an effort to pursue his assignment, but was effectively rejected and would then return to Shaw's office.  Further testimony indicated that requested work orders for the alarms were submitted but never approved.

Findings:

1.    The Owner's evidence that it incurred costs of $46,794 with Siemans Westinghouse in addressing alleged excessive alarm issues is undisputed.  However the Owner, as the claimant on this issue, bears the burden of proof to show that these damages were caused by or proximately resulted from Shaw's breach of either the EPC Contract or the March 14, 2004 Letter Agreement.

2.    The terms of the EPC Contract were superseded by the terms of the March 14, 2004 Letter Agreement as to satisfaction of existing claims by the Owner for excessive alarms, and the resolution provisions of Attachment One constituted a future executory substituted performance agreement.

3.    Shaw made a good faith effort to comply with the resolution provisions of Attachment One by making available the services of John Sedley, a DCS engineer, who attempted to perform his assigned task but was effectively rebuked by the Owner when the Owner failed to work interactively with Mr. Sedley and never approved submitted work orders. The tribunal concludes that Shaw's actions constituted an accord and satisfaction of any further obligations to address the excessive alarm issues.

4.    The Owner's final proposal is $46,794.  Shaw's final proposal on this issue is $0. Under the circumstances and the evidence, the Panel finds that Shaw's offer of $0 is more reasonable and appropriate.

## J. Owner Claim:  Cooling Tower Acid Piping Replacement

Background

In May 2004, acid piping to the cooling towers was found to be plugged with ferrous sulfate.  The acid storage tank is made of carbon steel and the acid piping between the storage tank and the cooling towers is 316 stainless steel.  The ferrous sulfate is a product of corrosion between sulfuric acid and carbon steel. The Owner replaced the 316 piping and valves and the acid in the tank at a cost of $57,108 which it is claiming against Shaw.

## Discussion

The Owner contended that its investigations indicated that sulfuric acid at concentrations above 75% is incompatible with 316 stainless steel.

Shaw responded saying that 316 stainless steel was fully compatible with 93% sulfuric acid, and the material which was found to be plugging the lines was typically caused by contaminated (diluted) acid corrosion.  Shaw also claims to have requested samples of acid or the results of acid analysis so that the actual concentration and purity of the acid could be determined.  The Owner refused to provide such evidence of the actual acid quality.

## Findings

1. Concentrated sulfuric acid (90 to 100%) at ambient temperatures is customarily stored in carbon steel tanks. The carbon steel is protected by a ferrous sulfate film that is dissolved by acid at lower concentrations or higher temperatures and which can be easily removed by erosion or turbulence from flowing acid.

2. The material which plugged the acid piping was probably ferrous sulfate from the carbon steel tank caused by a combination of lower concentrations, higher temperatures and/or impurities in the acid. Because the Owner refused to provide samples or analyses and did not present expert testimony on the subject, the tribunal is entitled to draw a negative inference regarding the purity of the acid.

3. 316 Stainless steel or high nickel alloys are customarily used for piping, pumps and valves handling sulfuric acid.  The stainless steels are used for the more concentrated acids and the high nickel alloys are used for more dilute acid, because diluted acid is more corrosive than concentrated acid.  316 stainless steel is compatible with 93% concentrated sulfuric acid and is customarily used for that service.

4. The plugged acid lines were probably caused by diluted or impure acid in the carbon steel tank.  Therefore there was no need to replace the 316 stainless steel piping.

5. The Owner has proposed damages of $57,150. The tribunal finds that Shaw's proposal of $0 is more reasonable and appropriate.

## K. Owner Claim: Turbine Building Crane Repairs and Certification

## Background:

The EPC Contract required Shaw to install a bridge crane system.  The Owner contends that Shaw breached the EPC Contract by failing to provide a bridge crane system in accordance with Industry Standards, applicable codes and the Scope Book, and by breaching its warranty obligations in failing to repair claimed deficiencies, requiring the Owner to incur repair costs of $116,916.00.  Shaw denied the Owner's claims, contending that the crane system was properly inspected and certified during construction and prior to the Owner accepting care, custody, and

control of the Project in March 2004. Shaw further contends that it honored its warranty obligations by addressing all valid deficiencies except one for which it submitted a Design Change Notice but never received the Owner's required authorization to perform.

Relevant Contract Provisions:

§ 3.1.2 of the EPC Contract provides, in part, that all equipment and materials ". . . shall be free from defects, shall conform to the standards of material and workmanship prevailing in the industry, shall be designed to adequately perform the function for which such Equipment was specified . . . and shall be of new and good quality."

§ 3.1.2 of the EPC Contract also provides that the " . . . Contractor will perform and prosecute all Work in accordance with the terms and conditions of this Contract . . . and Prudent Industry Practices."

§ 3.1.2 of the EPC Contract further provides, in part, that the " . . . Facility will be in compliance with the requirements of all Governmental Approvals and Rules."

The EPC Contract's Exhibit of Definitions defines Governmental Approval to include: "[a]ny authorization . . . approval . . . license . . . certification . . . or registration . . ." Governmental Rule is defined to include any "[a]ny statute, law, regulation, ordinance, rule, judgment, order . . . mandatory guideline or policy or other similar form of decision of or determination by . . . of the foregoing by any governmental unit."

§ 2.2.3 of the Scope Book provides that the system be "consistent with current utility industry practices."

Discussion:

In support of its position, Shaw produced certification and inspection records from American Crane & Equipment Corporation. Shaw further presented testimony from Steve Lamberto that the crane and rail system operated without any problems during the time when Shaw was in control of the crane. However, when the Owner had the bridge crane system's annual inspection in June 2004, the company performing the inspection, Crane & Hoist of Arizona, Inc. ("Crane & Hoist"), issued a Certificate stating that the bridge failed to meet OSHA requirements. Crane & Hoist also issued a written report on June 11, 2004 citing various provisions of OSHA, ANSI, ASME and CMAA which included a spreadsheet checklist of deficiencies and recommendations. Based on the Crane & Hoist report, the Owner issued a warranty notice to Shaw. Shaw rejected the "recommendations" as being non-requirements. Shaw further maintained that it had honored its warranty by addressing all alleged deficiencies with the exception of (1) the 45 degree angled expansion joints with a 1+" splice gap in the rails which Shaw contends was necessary, proper and met industry standards and code requirements, and (2) the system's rail clips for which it had submitted a DCN some five months earlier which the Owner never released Shaw to perform. Finally, Shaw contends that the Owner's total damage claim included costs of the annual inspection for which Shaw could not be held liable

after the Owner took care, custody, and control of the Project, and also included costs of repairs that were not required or which Shaw was not allowed to perform under the DCN.

Findings:

1.  The 45 degree angled expansion joint and splice gap did not violate any specific OSHA or other code requirement.

2.  Shaw complied with good industry practice in designing and constructing the crane rails with the 45 degree angled 1+" expansion joint which would allow for expansion of the rail system as connected to the building structures during periods of high temperatures and which would also avoid the concern of the crane wheels dropping into a valley as would occur with a butt-splice gap.

3.  Shaw met its warranty obligation to correct the alleged rail clip deficiencies by submitting a DCN so that Shaw could perform the Work, which the Owner failed to approve.

4.  Shaw is not liable to the Owner for the cost of annual inspections after the Owner took care, custody, and control of the crane, nor is Shaw liable to the Owner for the cost of repairs which it was neither required to perform (i.e., the 45 degree angled expansion joint gaps in the rails) or the Work which it offered to perform by way of the DCN (i.e., the alleged rail clip deficiencies).

5.  The Owner, as Claimant, bears the burden of proof to show that the expenses for which it seeks reimbursement from Shaw are a direct result of Shaw's breach of its contractual obligations, and to establish the amount of its damages with a reasonable degree of certainty. The Owner failed to carry these burdens.

6.  The Owner proposes $116,916.  Shaw proposes $58,000.  Under the circumstances and the evidence, the tribunal finds that Shaw's proposal of $58,000 is more reasonable and appropriate.

## L.  Owner Claim:  Cooling Tower Cable Tray Covers

Background:

The Owner claims that Shaw breached the requirements of the EPC Contract by not providing protective covers over the cantilevered cooling tower cable trays which run parallel to the length of the CTs.  The Owner contends this violated Prudent Industry Practices and the terms of the Scope Book that required that the cables be "weather protected."

Shaw contends that cable tray covers were not required.  Shaw contends that it complied with both the Scope Book and industry standards by installing weather protected cables which it claims were impervious to the elements and UV deterioration.

Relevant Contract Provisions:

§ 3.1.2 of the EPC Contract deals with Standard of Performance and provides, in part, that the Contractor shall perform all work in accordance with "all requirements of the Scope Book" and "Prudent Industry Practices." Prudent Industry Practices is defined, in part, as "practices engaged in or approved by a significant portion of the electrical generating industry" and "which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost. . .."

§ 3.16.6 of the Scope Book, entitled "Cable and Raceway," provides in part, that "Outdoor cable shall be weather protected." This section provides in another part that "The top tray will be fitted with removable cover where the tray stack runs below floor grating or in open areas subject to falling debris."

Discussion:

The Owner offered in evidence the Declaration of Aaron Ruth, who was employed by the Owner as an instrument control and electrical technician. Mr. Ruth attached to his Affidavit a series of color photographs of the exposed electrical cables showing what appeared to be accumulation of "crustatious like" coatings over the cables which in Mr. Ruth's opinion was damage due to direct sun, precipation, and cooling tower chemical mist. He also testified that, even though the Owner had submitted a punch list claim form to Shaw on July 9, 2003, Shaw had refused to install covers over the cables, claiming that they were already "weather proofed." Mr. Ruth further gave his opinion that the cables had identification markings which showed they were only "sunlight resistant" and were not marked to handle corrosive type conditions. Mr. Ruth testified that the Owner hired Sturgeon Electric to install covers over each layer of the cable trays, and attached additional photographs of the completed work. The Owner offered copies of Sturgeon Electric's invoice for $34,761 and Harquahala's check record in payment of the same.

The Owner also presented testimony by Malcolm Hubbard in support of its position that prudent industry practice required covers. Mr. Hubbard stated that, based on his experience at two other combined cycle plants, one of the first deficiencies he noted was the lack of cable tray covers.

Shaw acknowledged that the outdoor cable was to be "weather protected." However, Shaw contends that the Scope Book only required top cable tray covers in certain limited conditions where cable tray stacks were either below floor grating or in open areas subject to falling debris. Mr. Ray Sharp of Shaw testified that the cables installed were weather rated and that the cables were therefore weather protected by being impervious to the elements and to UV deterioration. Mr. Sharp further testified that he was not aware of any problems the Owner had encountered with the cables due to a lack of covers. Shaw also pointed out that the Owner had not replaced any of the cables which it claimed had been "damaged" due to the lack of covers, before hiring Sturgeon Electric to install the covers.

Findings:

    1.   The Owner's evidence that it incurred costs of $34,761 in installing cable tray covers to further protect the cables is undisputed.

    2.   The Owner, as Claimant, bears the burden of proof to show that these expenses were incurred as a direct result of Shaw's breach of its contractual obligations after being given Notice and opportunity to cure.

    3.   The tribunal finds that while the Scope Book could have been more clearly worded regarding weather protection for cables, prudent industry practices would require covers (at least for the top tray) due to the location of these cable trays along the side of the cooling tower where they would be exposed to potentially corrosive drips and mist, as well as UV rays from direct sunlight. Additionally, unrebutted testimony indicated that the cables did not appear to be marked to handle corrosive or all weather conditions but were only shown as "sunlight resistant."

    4.   The Owner's final proposal is $35,621. Shaw's final proposal on this issue is $0. Under the circumstances and the evidence, the Panel finds that the Owner's offer of $35,621 is more reasonable and appropriate.

## M. Owner Claim: Vapor Compression Erosion

Background:

    The Owner claims that Shaw breached the EPC Contract by failing to provide proper quality vapor compressor impellers which were fit for their intended purpose as evidenced by excessive chemical erosion of the lobes. This condition was reported to Shaw by way of a Punch List Submittal Form on October 27, 2003 when the condition was discovered following disassembling of the vapor compressors for retiming. The Owner contends that either the material composition of the impellers is incorrect for the particular rotor application or that they should have been protectively coated.

    Shaw's construction site manager, Steve Lamberto, testified that he undertook an investigation of the issue upon receipt of the punch list notice. He states that he contacted the equipment supplier, HPD (formerly U.S. Filter) and the manufacturer, Dresser. As a result of the investigations, HPD concluded that while some unusual early wear (erosion) was noted, this was most likely attributed to upset conditions occurring during startup and commissioning when slurry existing below the compressors came in contact with the impellers. It was further determined that operational data showed that the compressors had not become less efficient and, in fact, were working better than the original design. HPD's report further stated that the lobes were in acceptable condition and would continue to operate in accordance with design conditions. Mr. Lamberto testified that he passed the inspection reports on to the Owner and recommended that this punch list item be closed.

Relevant Contract Provisions:

§ 3.1.2 of the EPC Contract provides, in part, that all equipment and materials ". . . shall be free from defects, shall conform to the standards of material and workmanship prevailing in the industry, shall be designed to adequately perform the function for which such Equipment was specified . . . and shall be new and of good quality . . .."

§ 3.1.2 of the EPC Contract also provides that the "contractor will perform and prosecute all Work in accordance with the terms and conditions of this Contract . . . and Prudent Industry Practices."

Discussion:

Photographs of the compressor lobes which were used as exhibits by both parties clearly demonstrated that some erosion and pitting has occurred. Malcolm Hubbard, the Owner's Project Manager, testified that the damage to the impellers was "directly linked to the longevity or life expectancy of the blower, as well as the efficiency degradation of the blower itself." Mr. Hubbard also testified that Dresser had recommended coated impellers to minimize erosion. However, Mr. Hubbard also testified on cross-examination that he could not testify that the erosion had worsened over the several year period since the inspection, and that the Owner had not replaced the compressors. The only evidence of damages presented by the Owner was a quote for a total compressor replacement with Armoloy coating on the impellers at a cost of $65,624 per unit. Mr. Hubbard also testified that he thought the Owner would incur an estimated cost of approximately $10,000 in connection with the total replacement.

Findings:

1.    The tribunal notes that the Owner's claim appears to be focused primarily on a decreased life expectancy or longevity of the vapor compressors due to chemical erosion, which most likely occurred from contact with upset conditions in which slurry from the ZLD system came in contact with the impellers during the initial startup of the units. This should not be a reoccurring event.

2.    The Owner, as Claimant, has the burden of proof with respect to the amount of damages claimed. The Owner acknowledges that it has not incurred any damages to date, and presented nonconvincing testimony relating to any effect that the erosion would have on the life expectancy of the blower.

3.    Mr. Hubbard further failed to provide any foundation for the estimate which he thought would be about $10,000 for installation and retesting of the new compressors.

4.    The Owner has failed to carry its burden of proof that it is entitled to claim the full replacement cost of two compressors with coated impellers at $65,624 per unit, plus an estimated $10,000 for installation, for a total cost of $141,248.

5. The Owner has failed to present any evidence which would provide the tribunal with a basis on which to consider any diminished life expectancy of the impellers.

6. The Owner's proposal is $100,000. Shaw's final proposal is $0. Under the circumstances and the evidence, the tribunal finds that Shaw's offer of $0 is more reasonable and appropriate.

### 4. DELAY DAMAGES

There is no question that Shaw was late in achieving Substantial Completion of the Units and the Facility. The Owner has claimed that Shaw is liable for Liquidated Damages for late Substantial Completion of the Units and the Facility. Alternatively the Owner claims that if the tribunal finds that it is not entitled to Liquidated Damages, then the Owner is entitled to recover its Actual Damages.

In order to rule on the Owner's claim it is necessary to determine first, the duration of the delay; second, whether the Owner is entitled to recover Liquidated Damages for the delay; and third, if Liquidated Damages are not allowed, what were the Owner's Actual Damages.

### A. Determinations as to the durations of Shaw's delays

1. Start delay dates:

Although there was some earlier disagreement between the parties as to starting dates of the delay period for Actual Damages purposes, at the Hearing the parties agreed that the starting dates of delays for all purposes were the dates for Substantial Completion that were stated in the Settlement Agreement.

2. Ending dates of delays

The Owner has proposed different sets of ending dates for delay durations:

With respect to Liquidated damages, the Owner has not assessed Unit Liquidated Damages beyond December 31, 2003 (although the Units were not accepted by the Owner as Substantially Complete until March 14, 2004, the Owner elected to cease the assessment of liquidated damages for Unit delays as of the fuel shut off on December 31, 2003). However, the Owner has assessed Facility Liquidated Damages through September 11, 2004, the date it accepted Substantial Completion for the Facility.

With respect to Actual Damages, the Owner claims delay damages on the Units up to the Fall 2004 dates that each unit was "commercially dispatched," and delay damages on the Facility up to September 11, 2004, the day it considered the Facility to have been Substantially Completed.

Shaw contends, first, that the Owner is not entitled to recover Liquidated Damages; and second, that the Owner is not entitled to recover any delay damages after the dates when Shaw

declared Substantial Completion, or at the latest December 31, 2003, the date of the fuel shut off.

The Owner's and Shaw's various contentions as to the actual dates for their respective calculations of delay durations are set out in tabular form as follows:

3. Table of Contentions as to Delay Durations

| | For Purposes of | Start Basis | End Event | Start Delay | End Delay | Delay Duration |
|---|---|---|---|---|---|---|
| **UNIT 1** | | | | | | |
| Shaw | All Damages | SA | Fuel Shut Off | 06/26/03 | 12/31/03 | 188 |
| Owner | Liquidated Damages | SA | Fuel Shut Off | 06/26/03 | 12/31/03 | 188 |
| Owner | Reasonableness* | SA | Shaw Forecast | 06/26/03 | 07/18/03 | 22 |
| Owner | Actual Damages | SA | Commercial Dispatch | 06/26/03 | 07/28/04 | 398 |
| **UNIT 2** | | | | | | |
| Shaw | All Damages | SA | Fuel Shut Off | 07/09/03 | 12/31/03 | 175 |
| Owner | Liquidated Damages | SA | Fuel Shut Off | 07/09/03 | 12/31/03 | 175 |
| Owner | Reasonableness* | SA | Shaw Forecast | 07/09/03 | 08/10/03 | 32 |
| Owner | Actual Damages | SA | Commercial Dispatch | 07/09/03 | 09/11/04 | 430 |
| **UNIT 3** | | | | | | |
| Shaw | All Damages | SA | Fuel Shut Off | 08/22/03 | 12/31/03 | 131 |
| Owner | Liquidated Damages | SA | Fuel Shut Off | 08/22/03 | 12/31/03 | 131 |
| Owner | Reasonableness* | SA | Shaw Forecast | 08/22/03 | 09/14/03 | 23 |
| Owner | Actual Damages | SA | Commercial Dispatch | 08/22/03 | 08/19/04 | 363 |
| **FACILITY** | | | | | | |
| Shaw | All Damages | SA | Fuel Shut Off | 09/07/03 | 12/31/03 | 115 |
| Owner | Liquidated Damages | SA | Fuel Shut Off | 09/07/03 | 12/31/03 | 115 |
| Owner | Actual Damages | SA | Commercial Dispatch | 09/07/03 | 09/11/04 | 370 |
| **OVERALL DURATION** | | | | | | |
| Shaw | All Damages | SA | Fuel Shut Off | 06/26/03 | 12/31/03 | 188 |
| Owner | Liquidated Damages | SA | Fuel Shut Off | 06/26/03 | 12/31/03 | 188 |

AO 1478851.1

| Owner | Actual Damages | SA | Commercial Dispatch | 06/26/03 | 09/11/04 | 443 |

SA = Settlement Agreement

\* "Reasonableness" = the delays which Shaw arguably forecasted in May 2003, upon which the Owner based its "reasonableness" calculation for Liquidated Damages purposes.

(Since the intervals between Shaw's declared Substantial Completion dates and December 31, 2003 are not sufficiently material to affect the tribunal's selection between the parties' respective final "baseball" proposals, Shaw's declared Substantial Completion dates have not been included in the above table.)

4.  Discussion as to delay durations:

   Ending delay dates for Unit Delays:

   Even though the Owner ceased assessing Liquidated Damages for Units as of the date of the fuel shut off on December 31, 2003, it contends that for the purpose of calculating Actual Damages for Unit delays, the criterion should be the date of "commercial dispatch;" and that for the purpose of calculating Actual Damages for Unit delays, damages for each Unit's delay should run until the Unit was commercially dispatched.

   The Owner contends that punch list and equipment problems, including cooling tower fan blades, Zero Liquid Discharge system, Steam Turbine lock ups, Continuous Emissions Monitoring System certification, and Unit 2 6.9 kV Switchgear, delayed the availability of the Units for commercial dispatch.

   Shaw contends that the ending dates for Unit Substantial Completion should be Shaw's declared Unit Substantial Completion dates in the Fall of 2003. Alternatively Shaw contends that delays should end no later than December 31, 2003, because the Owner's decision to shut off fuel on December 31, 2003 represented a fundamental breach of the EPC Contract, and as a result the Owner is not entitled to assess damages for delays occurring after that date.

   Ending delay dates for Facility Delay:

   The Owner contends that the Facility Delay period should end on September 11, 2004, whether calculating Liquidated Damages or Actual Damages, on the ground that the intended purpose of Facility Damages is to insure that common systems are available to support commercial operations, and thus Facility Substantial Completion could not be accepted until the last Unit (Unit No. 2) was available for commercial dispatch.

   Shaw contends:

   a.  The assessment of Facility delay damages should cease as of December 24, 2003, the date that Shaw declared that the Facility was Substantially Complete, or at the latest, December 31, 2003, the date of the fuel shut off.

b. The assessment of Facility Liquidated Damages was based on the unavailability of Unit 2 for commercial dispatch until September 11, 2004. This is contrary to the Contract which provides that Liquidated Damages are curtailed at Substantial Completion. Furthermore, commercial dispatch is based upon market conditions which are not within the control of Shaw.

c. The commercial dispatch dates used for Facility Substantial Completion are extra-contractual, arbitrary and not related to Shaw's performance.

d. All of the factors which the Owner alleges were responsible for denying Facility Substantial Completion until September 2004 were converted to warranty issues by the March 12, 2004 agreement.

e. In any event the Owner is not entitled to collect any delay damages for Facility delays after it restricted Shaw's access to the site on March 15, 2004.

5. Findings as to delay durations:

1. The tribunal notes that according to both the EPC Contract and the Settlement Agreement, schedule delays, and therefore the daily assessments of damages for those delays, cease as of the date when the Contractor achieves Substantial Completion. By the Contract and by long-standing precedent in the construction industry, delay damages may not be assessed beyond the date of Substantial Completion.

2. The tribunal is of the opinion that the availability of Unit 2 for commercial dispatch was actually controlled by the consequences of the 6.9kV switch gear explosion which occurred on March 30, 2004, two weeks after the Owner had assumed care, custody and control of the plant, rather than by the punch list/warranty issues cited by the Owner.

3. The tribunal finds that the Owner's September 11, 2004 ending date for Substantial Completion of the Facility is unreasonable, for a number of reasons: First, beginning with the effective date of the Letter Agreement, March 14, 2003, Shaw no longer had unfettered access to the plant for completion of its work, and much of that work required plant operations, hence fuel, to complete. Second, a decision to offer units for commercial dispatch was usually based on economic factors which had nothing to do with Shaw's performance. Third, there is no contractual basis for using "commercial dispatch" to determine the date for Facility Substantial Completion. The tribunal finds therefore that the date of December 31, 2003 is more reasonable and appropriate for ending the calculation of Actual Damages.

4. The tribunal therefore finds that for the purpose of determining delay damages, whether for calculating Liquidated Damages or Actual Damages, the delay period began on the dates established by the Settlement Agreement for Substantial Completion dates, and ended on December 31, 2003.

## B. Determinations as to Liquidated Damages

The Tribunal found in the related Covert Award that the date for measuring the reasonableness of Liquidated Damages should be as of the date of the May 15, 2003 Settlement Agreement, rather than the August 13, 2001 date of the original EPC Contract. That finding also applies equally to the Harquahala case, and therefore the following analysis will evaluate the reasonableness of Liquidated Damages as of May 15, 2003.

1. <u>Discussion</u>:

The Owner has assessed and collected $31,122,000 in delay Liquidated Damages for Unit delays through December 31, 2003, and seeks to further impose $16,002,000 in LDs for Facility delays from January 1, 2004 through September 11, 2004 for a total assessment of $47,124,000.

The Owner justifies its LD assessments, measured as of May 15, 2003, as follows:

a. The Owner calculated the damages (delay costs and net lost revenue) which prospectively could have been anticipated as of May 15, 2003, for the foreshortened delay period which Shaw's own projections forecast at that time. The Owner calculated that the anticipated delay costs, which consist primarily of excess fuel costs, could have been projected to be $12,000 per day, and that the net lost revenues during the same period could have been projected to be $142,000 per day, for a total projected delay damage of $154,000 per day. This calculation by the Owner comes reasonably close to the contract maximum LD rate of $189,000 per day.

b. The Owner says it was not necessary, when establishing LD rates, that the projected damages be calculated to cover the same delay costs that are actually being claimed, and that it is only necessary that an objective standard be used. Using Interest During Construction "IDC") costs represents such a standard, and the forecasted IDC costs are in fact comparable to the LD rates actually used.

Shaw responds to the Owner's LD assessment as follows:

a. The Liquidated Damage rates set forth in the EPC Contract as amended by the Settlement Agreement were not a reasonable estimate of the damages which, as of May 15, 2003, were likely to occur as a result of Shaw's late performance. (Prospective Test)

b. The LD amounts set forth in the EPC Contract as amended by the Settlement Agreement were grossly disproportionate to the actual damages which, as of May 15, 2003, would reasonably have occurred as a result of Shaw's late performance. (Retrospective Test)

c. At the time of the Settlement Agreement, May 15, 2003, the Owner did not reevaluate the damages that it was likely to sustain for late performance, although at that time the potential for damages had changed drastically since the time of the EPC contract date when the LD rates were originally set.

d. The Owner's original calculation of the contract daily rate for LDs was based upon costs, primarily interest during construction, which did not vary as a result of the delay, and which were not charged against the Owner in any event. The resulting LD rates would not be reasonable even if, coincidentally, they approximated the forecasted actual damages, because they were not calculated to compensate the Owner for the consequences of delay.

e. The Owner's calculation of a level daily rate for LDs failed to account for the very significant difference between forecasted delay damages for delays occurring during summer months of peak revenue, and delays occurring during winter months of little or no revenue.

2. Findings as to Liquidated Damages

1. At the time of the May 15, 2003 Settlement Agreement the Owner was well aware of the collapse of the energy market due to overcapacity, high gas prices, and stalled deregulation, and the fact that new transmission lines serving Southern California had not been built. The Owner nevertheless did not reevaluate at that time the damages which it was likely to sustain for late performance, although the potential for actual damages had changed drastically since the EPC contract date.

2. The Owner defends the reasonableness of the $189,000 total Contract LD daily rate by forecasting delay damages totaling $3,790,000 at a rate of $154,000 per day. That daily rate was developed by spreading the forecasted damages for each unit over a shortened delay duration averaging approximately 26 days (the delay period which Shaw arguably expected to occur). The actual delay duration, extending from late June to the end of December 2003, was 188 days. Although the Owner's calculated daily delay damages of $154,000 may appear to be reasonable compared to the $189,000 daily Contract LD rate, a forecasted daily rate based on the actual 188 day delay duration would be about $20,000 per day, which would make the total daily Contract LD rate grossly disproportionate to the estimated actual delay damages.

3. Viewed from the perspective of total LDs rather than daily rates, the Owner's CRA experts estimated 2003 delay damages at $3,790,000. That forecast compares very unfavorably with the $31,122,000 Liquidated Damages which the Owner has assessed and withheld for 2003.

4. In view of the foregoing considerations the tribunal finds that Contract liquidated damage rates, as amended by the Settlement Agreement, were not a reasonable forecast of the likely delay damages and are therefore unenforceable.

## C. Determinations as to Actual Damages

Inasmuch as the Contract Liquidated Damages rates have been determined to be unenforceable, the Owner is entitled to establish the Actual Damages which it suffered as the result of Shaw's delays.

1. Discussion:

The Owner claimed as Actual Damages:

(a) $24.9 million in net lost revenues;

(b) the net cost of operating the facility, consisting of (i) $0.2 million in construction management costs less avoided costs, and (ii) $12.7 million in excess fuel costs; and

(c) $6.3 million to compensate it for the loss of benefits under the Settlement Agreement, on the ground that if the Owner cannot recover Liquidated Damages, then it is entitled to a refund of the portion of the compensation paid to Shaw under the Settlement Agreement which the Owner contends represents the consideration for Shaw's agreement to be subject to Liquidated Damages.

The Owner calculated the $37.8 million of delay costs in categories (a) and (b) above for a delay period extending from June 26, 2003 to September 11, 2004, approximately 14 ½ months.

The Owner supported the $12.7 million "excess fuel claim" component of its Actual Damages claim as follows:

a. In its July 2005 report, CRA, the Owner's expert, advised that normal fuel usage for testing and starting up a three unit plant of this type would be 4.2 million MMBTU's compared to the 10.9 million MMBTU actually used.

b. In its Post Hearing Brief the Owner redefined "normal" fuel usage to be 6.0 million MMBTU (three times the 2.0 million MMBTU fuel used for Unit 3), which, when compared to the 10.2 million MMBTU actually consumed, produced an excess fuel figure of 4.2 million MMBTU, and an excess fuel cost claim of $12.7 million. This was described as a "measured mile" approach.

c. Excess fuel cost is a legitimate part of its delay claim and not an excluded consequential damages claim.

Shaw responded to the "net lost revenues" portion of the Owner's Actual Damages claim (category (a) above) as follows:

The Owner is not entitled to recover net lost revenue damages because:

a. A new business must establish a proper basis for estimating lost revenues, and other merchant generators in the area had failed.

b. Lost revenues are not recoverable under the EPC Contract provisions which exclude claims for consequential damages.

c. The actual net lost revenue estimates prepared by the Owner's experts include lost revenues for periods after the Owner had shut off fuel and are overly optimistic; a more reasonable estimate of the actual net lost revenue during 2003 would be $799,000.

Shaw responded to the Owner's "excess fuel costs" component of its Actual Damages claim (category (b) (ii) above) as follows:

a. The excess fuel cost claim is barred as a consequential damage.

b. The Owner has never established a basis for determining "normal" fuel usage and cannot, therefore, identify excess fuel usage.

c. The Owner never advised Shaw of its expectations regarding normal fuel usage.

d. The Owner's own internal projections of fuel usage were much greater than the amount of fuel that was actually consumed.

e. The Owner's "measured mile" approach, which assumes that Units 1 and 2 would use the same amount of fuel as was used on Unit 3, makes no allowance for the experience and learning curve factors which would be expected to significantly reduce the fuel usage for the last Unit of a three-Unit plant.

Shaw responded to the Owner's claim for "loss of benefits" under the Settlement Agreement (category (c) above) by arguing that amounts paid to Shaw under the Settlement Agreement were compensation for previously guaranteed cost overruns, and were not paid to secure a future benefit.

2. Findings as to Actual Damages:

(a) With respect to the Owner's "net lost revenue" claim (category (a) above):

1. As has been previously found, the delay period during which the Owner is entitled to recover its Actual Damages began with the Substantial Completion dates established by the Settlement Agreement and ended on December 31, 2003.

2. Experts from both parties projected actual 2003 net lost revenues at about $5 million when evaluating the reasonableness of the contract Liquidated Damages as of May 15, 2003; however the expert estimates of actual net lost revenues differed wildly ($18 million v. $0.8 million) when evaluating Actual Damages as a replacement for unenforceable Liquidated Damages.

3. The $5 million "reasonableness" estimates of both parties and Shaw's $0.8 million "replacement" estimate were all based on delays during 2003, whereas the Owner's $18 million replacement estimate was based on delays during both 2003 and 2004.

4. Shaw revised the data inputs to its estimating model regarding transmission and regulatory constraints and competing generating facilities to produce its $0.8 million estimate of actual net lost revenue.

5. The term "actual" damages, as used in this context, is misleading. These actual damages are not actual at all. The experts attempted to identify the revenues which would have been available if the units had operated during the delay duration. The experts attempted to prove the value of something which never happened. This, together with the 2004 delay damages claimed by the Owner, and the input data changes made by Shaw, would explain some of the differences between the actual damage estimates. However, all of these factors do not readily explain the difference between the Owner's net revenue loss estimate of $18 million and Shaw's estimate of $0.8 million.

6. Throughout the Harquahala hearings the experts from both sides vigorously attacked each other's methodology and results. Each expert relied upon a sophisticated computer program which modeled the operation of the Harquahala energy market to produce projected net lost revenues.

7. CRA, the Owner's expert, said that their model was based upon classical economic supply and demand theory such that the price of power would reflect all of the various considerations, including such factors as transmission constraints, load demands, and availability of other suppliers. The CRA model assumed that when the market price of power exceeded the variable cost of producing power by one dollar, the plant would generate at full power for a given period such as 16 hours.

8. Shaw's expert, NCI, criticized that approach saying that it assumed that the units would be dispatched purely on merit, that there would be unlimited buyers available, that the market prices which are used in the analysis were real, and that there would be no regulatory or physical constraints. NCI also said that the results produced by the CRA analysis were not consistent with actual operating data. CRA defended its analysis and responded that the NCI model was out of date and unpopular.

9. The Arbitrators concluded, after hearing at length from the parties' experts, that lost net revenues on the Harquahala project are too mysterious and speculative to form the basis of an arbitration award. The arbitrators were nevertheless convinced that the Owner did suffer real damages as a result of Shaw's failure to deliver the plant in time for the summer 2003 peak season, although not to the degree asserted in the Owner's counterclaim.

(b) With respect to the Owner's "excess fuel costs" claim (category (b) (ii) above):

1. The fact that the same 4.2 million MMBTU fuel figure is used in both the 2005 and the 2006 statements of the Owner's claim might lead the reader to miss the significant change which occurred. In July 2005 4.2 million MMBTU represented the normal fuel which should be used. In March 2006, 4.2 million MMBTU represents the excess fuel used.

2. The Harquahala plant combustion turbine was a relatively new design and as such was subject to unusually long commissioning durations for the early units. Siemens Westinghouse, the turbine manufacturer, had experienced similar delays at other plants incorporating this new design, but did not disclose at the hearing the resulting fuel usage, or any basis upon which "typical" startup fuel usage could be determined. Although specific problems may have been

unique to each plant, knowledge that delays were experienced and the resulting excess fuel costs would have been helpful to our understanding of this issue.

      3.  Testimony was presented indicating that a 26 day commissioning period was theoretically possible, and that a 70 day commissioning period was routinely scheduled. Neither of these durations can be considered "normal" for an unproven design. (This fact was recognized by the EPC Contract, which provided that excess fuel would be treated as a Cost of the Work. That sensible provision had been included in the Supplementary Agreement, which was later voided by the May 15, 2003 Settlement Agreement.)

      4.  If learning curve factors were applied to the measured mile approach taken by the Owner, the resulting excess fuel cost would be significantly less than the $12.7 million claimed. Other factors related to the uncertainty of starting up a newly designed power plant would need to be applied in order to identify a reasonable claim.

      5.  As a result of Shaw's delays prior to December 31, 2003 and the Settlement Agreement's elimination of excess fuel costs as a Cost of the Work, Shaw theoretically was exposed to some liability for excess fuel costs, which would add to the net lost revenue delay damages. However, the evidence presented at the hearing did not establish an adequate basis upon which to quantify the amount of excess fuel used.

      (c)  With respect to the Owner's claim for "loss of benefits" under the Settlement Agreement (category (c) above):

      The tribunal finds that amounts paid by the Owner and others to Shaw under the Settlement Agreement were compensation for previously guaranteed cost overruns, and were not paid to secure a future benefit.

      (d)  The tribunal deliberated at length on the question of whether or not net lost revenues and excess fuel costs were barred as consequential damages. The tribunal's difficulty arose from the following conflicting considerations: (1) costs of this kind could be deemed reasonably foreseeable and a direct consequence of a power plant delay (and thus arguably not consequential damages if proved with a reasonable degree of certainty); (2) Section 25.4 of the EPC Contract states that "loss of profits or revenues" and "fuel costs" are consequential damages and therefore not recoverable; and (3) the tribunal was concerned that treating these costs as unrecoverable consequential damages could be unfair to the Owner. However, in the final analysis, after due consideration of all contract provisions and facts affecting delay damages, the tribunal concluded that in the context of the "baseball" proposals of the parties, the ultimate finding on delay damages would not be materially affected, regardless of whether or not net lost revenues and fuel costs were ruled to be consequential damages.

## D.  Ultimate Finding on the Owner's Claim for Delay Damages

      The Owner has proposed delay damages of $23,000,000. In light of the evidence and the considerations discussed above, the tribunal finds that Shaw's proposal of $8,000,000 delay damages is more reasonable and appropriate.

## 5. RULING ON SHAW'S MOTION TO EXCLUDE A PORTION OF EXPERT REPORT

On September 7, 2005 Shaw filed a Motion asking the tribunal to strike portions of a Charles River Associates expert report on Actual Damages, which relied on purported facts as to "typical fuel use."   The tribunal decided to defer ruling on that motion until it had heard further evidence relating to this issue.  In view of the evidence discussed on page 36 of this Award, and the tribunal's findings on page 38 of this Award related to the Owner's claim of excessive fuel use by Shaw, the issue raised by the Motion has been rendered moot.

## 6. AWARD

Accordingly, the tribunal awards to Shaw against New Harquahala the sum of $37,315,131, as has been set out in Section 1 of this Award.

The parties are to share equally in the costs of this arbitration, including the fees and expenses of the arbitrators.

Any issues as to interest on amounts awarded, and the allocation of the fees of the American Arbitration Association, have been deferred, by consent of the parties, until a later time.

In order to avoid any doubt, the arbitrators intend that this Award with respect to the Harquahala Project be a Final Award as to all issues raised in the Harquahala case except those that have specifically been deferred by agreement.

**Signature Page**

_____        _____        _____
Thomas J. Burke                        James P. Groton                        H. Fielder Martin

I, Thomas J. Burke, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Date: 6/30/06 _____                        _____
                                                                                                Thomas J. Burke

I, James P. Groton, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Date: 6/30/06 _____                        _____
                                                                                                James P. Groton

I, H. Fielder Martin, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Date: 06/30/06 _____                        _____
                                                                                                H. Fielder Martin